UNITED STATES of America, Appellee,

v.

George W. SCHELL; John B. Cain, Jr., a/k/a John Boy; Thomas R. Stevens, a/k/a Hyper; and Freda Virginia Gallo Wilson, Appellants.

No. 84–5337.

United States Court of Appeals,
Fourth Circuit.

Argued July 15, 1985.

Decided Oct. 16, 1985.

---

Douglas A. Cornelius, Clarksburg, W.Va., William F. Byrne, John W. Cooper, Parsons, W.Va., Brent Beveridge, Fairmont, W.Va. (Matthew H. Fair, Elkins, W.Va., on brief) for appellants.

William A. Kolibash, U.S. Atty., Wheeling, W.Va., Stephen R. Cochell, Sp. Asst. U.S. Atty., Detroit, Mich., for appellee.

Before HARRISON L. WINTER, Chief Judge, and WIDENER and K.K. HALL, Circuit Judges.

K.K. HALL, Circuit Judge:

George W. Schell, John B. Cain, Jr., Thomas R. Stevens, and Freda Virginia Gallo Wilson appeal from their jury convictions of numerous crimes, including violations of the Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, *et seq.;* conspiracy to distribute

and the distribution of controlled substances, in violation of 21 U.S.C. § 846; and violations of the Travel Act, 18 U.S.C. § 1952. We affirm in part and reverse in part.

## I.

In April, 1983, Cain, Wilson, and Frank Maley, went together to the home of Clarksburg, West Virginia, attorney David A. Jividen to ask Jividen to represent Cain with respect to an ongoing grand jury investigation of a drug organization in northern West Virginia. Maley informed Jividen that a grand jury subpoena had been served upon Cain and Cain told Jividen that he wished to invoke his fifth amendment privilege against self-incrimination. Wilson stated to Jividen that her son, John Edward Wilson, had been wrongfully subpoenaed, that they were all innocent of any wrongdoing, and that she could not understand the reason for the subpoenae. Jividen replied that he was not sure if he would represent Cain but promised to contact the federal authorities on Cain's behalf. Thereafter, Jividen notified the United States Attorney that Cain intended to assert the fifth amendment and was informed that Cain would be released from his grand jury subpoena.

Jividen then telephoned Cain and advised him that if he wished to invoke the fifth amendment, he did not have to appear before the grand jury. Jividen also informed Cain that if he wanted to speak to Jividen further about the matter, they could set up an appointment to go over the details of the case. After explaining that any employment relationship between them had terminated, Jividen informed Cain of the amount due for services rendered and requested that Cain make payment that day. Cain complied with that request.

After speaking with Cain, Jividen agreed to represent Kimberly Lindsey when she appeared before the same grand jury.[1] That same day, Jividen was contacted by Freda Wilson, who also requested representation in connection with a related grand jury subpoena. Before agreeing to represent Wilson, Jividen discussed the matter with Lindsey, who assured him that neither she nor Wilson had anything to hide, that no type of conflict existed, and that she had no objection to Jividen's representation of Wilson.

Later that day, Cain approached Jividen about representing his brother, Steve Cain, before the grand jury. Jividen initially informed appellant that he could not represent his brother, because he had already agreed to represent two other individuals before the same grand jury. Jividen agreed, however, to contact the United States Attorney's Office in order to find out whether Steve Cain's grand jury appearance was required, and he did so.

Jividen met with Lindsey and Wilson when the grand jury convened on April 26, 1983. He spoke with Wilson before she testified and again during a break in her testimony. Jividen also talked with Steve Cain before he entered the grand jury room and after he gave his testimony. Following their grand jury appearances, Jividen had no further contact with Lindsey, Wilson, or Steve Cain. He also had no further contact with John Cain.

Less than four months later, on August 8, 1983, Jividen was employed as an Assistant United States Attorney for the Northern District of West Virginia, and, on November 13, 1983, was designated as the Northern District of West Virginia Coordinator for the Presidential Narcotics Task Force. Before beginning his employment with the United States Attorney's Office, Jividen informed the United States Attorney that he had previously represented John Cain. After joining the United States Attorney's Office and learning that Wilson was a possible target of a grand jury investigation, Jividen also notified the United States Attorney of his prior representation of Freda Wilson, Kimberly Lindsey, and

---

1. Lindsey had previously contacted Jividen, who had informed her that he would have to consider any potential conflicts of interest before agreeing to represent her. The termination of his relationship with Cain eliminated any conflicts problem.

Steve Cain. Jividen was informed that he would not participate in the gathering of evidence against Wilson, Lindsey, or the Cain brothers. In addition, all other Assistant United States Attorneys and administrative agents were advised that Jividen was not to participate in the government's cases against Wilson, Lindsey, or the Cains. Jividen subsequently appeared before the grand jury in his capacity as Assistant United States Attorney.[2]

Subsequently, appellants and thirty-five others were charged in a 465-page, 344-count indictment.[3] The indictment alleged the existence of an associated-in-fact RICO enterprise. It charged that appellants participated in a RICO enterprise run by Carl Lee Gallo, John Gallo, unindicted coconspirator Rudolph Zaccagnini, and others. The indictment alleged that Carl Lee Gallo controlled an enterprise consisting of separate units of persons, including appellants, devoted to the distribution of methamphetamine, LSD, cocaine, and marijuana. Appellants were charged, *inter alia*, with substantive violations of RICO (Count 1), conspiracy to commit RICO violations (Count 2), conspiracy to distribute methamphetamine, a Schedule II controlled substance (Count 333), and violations of the Travel Act.

Before trial, the district court granted a trial management motion by the government, ordering that the four appellants be tried separately from the other individuals charged in the indictment. The district court limited the government's evidence under Count 2 (conspiracy to commit RICO violations) to a consideration of twenty-nine charges and thirty-five overt acts listed. Following the district court's trial management order, appellants Schell, Cain, and Stevens filed pre-trial motions for severance, which were denied. In addition, Schell filed a pre-trial motion to dismiss all

counts against him on the ground of double jeopardy, due to his previous conviction in New Jersey of conspiracy to manufacture and to possess with intent to distribute methamphetamine. This motion was also denied by the trial court.

Schell, Cain, Stevens, and Wilson filed further motions to dismiss the indictment against them and/or to disqualify the United States Attorney's Office from further participation in the case, maintaining that there had been a conflict of interest and that Jividen had been an unauthorized person to appear before the grand jury. They based these claims on Jividen's prior representation of John and Steve Cain, Wilson, and Lindsey. A number of evidentiary hearings were held on the motions, at which time Jividen, John Cain, and Wilson, among others, testified. Jividen stated that he did not know of any incriminating evidence against John Cain or Freda Wilson. He asserted that he was not aware of the evidence to be presented against them nor of the acts which comprised the charges in the indictment.

Cain testified that he had told Jividen that he had driven a taxi for the Gallos for nineteen or twenty years. He stated that he had further informed Jividen that he had used drugs with the Gallos. According to Cain, he discussed matters with Jividen that he had not discussed with anyone but his present attorney.

Wilson said that she did not tell Jividen anything about being involved in a criminal act of any kind. She also testified that she did not say anything to the attorney about her son being involved in any type of criminal activity. Wilson stated that her primary point of discussion when she spoke with Jividen dealt with her concern that her son was being harassed by the authorities.

2. Four separate grand juries convened to investigate the Gallo organization. Jividen appeared before the fourth grand jury, which convened in September, 1983. Lindsey, Wilson, and Steve Cain, who had testified before the third grand jury in April, 1983, did not testify before the fourth grand jury.

3. Steve Cain was not indicted. Lindsey was indicted and entered into a plea bargain agreement under which she pleaded guilty to one count of conspiracy to distribute methamphetamine. As a part of her plea bargain agreement, Lindsey agreed to testify at the trial of the other defendants.

In an affidavit which she filed with the district court, Lindsey stated that she was directed by Freda Wilson and Wilson's son to go to Jividen, and that she was specifically instructed to tell him: (1) that she wanted to assert the fifth amendment when called before the grand jury; and (2) that she had no knowledge whatsoever of, or involvement in, the sale or distribution of controlled substances in the Clarksburg, West Virginia, area. She stated that she did not tell Jividen anything about her criminal involvement or the criminal involvement of anyone else. Lindsey said further that following their grand jury testimony, she talked with Wilson and Steve Cain about their testimony and they all agreed that none of them had told Jividen anything about the sale or distribution of controlled substances.

Following the hearings, the district court ruled that there was no impropriety on Jividen's part or on the part of the United States Attorney's Office, and that "there was not an unauthorized person before the Grand Jury." The district court, however, ordered Jividen and his wife, Assistant United States Attorney Betsy C. Steinfeld, not to participate in cases in which Wilson and Cain were defendants, witnesses, or potential witnesses.

At trial, the evidence established that Rudolph Zaccagnini controlled cocaine distribution for Carl Lee Gallo, and John Gallo controlled methamphetamine distribution for the Gallo organization. According to the trial testimony, Schell met with John Gallo twice in 1982 and the two of them went to see Carl Lee Gallo on one of those occasions. Toll records of United Taxi, Inc. demonstrated frequent telephone contact between Schell, in Bristol, Pennsylvania, and individuals in Clarksburg, West Virginia, over an extended period of time. The evidence further revealed that on numerous occasions Schell supplied pound quantities of methamphetamine to John Gallo,

who travelled from West Virginia to Pennsylvania for the sole purpose of purchasing Schell's product. Testimony also established that Schell visited Clarksburg on several occasions.

With respect to John Cain, the evidence showed that he was an "enforcer" and bodyguard for Carl Lee Gallo and that he acted as bodyguard for John Gallo on drug-buying trips to Bristol, Pennsylvania. It was established that appellant Stevens was part of Zaccagnini's cocaine distribution network and that he set up a number of large-scale cocaine sales between members of the Pagan Motorcycle Gang, Zaccagnini, and Carl Lee Gallo. Testimony further showed that Stevens distributed large quantities of methamphetamine for the Gallo organization.

The evidence at trial also revealed that Wilson, who was Carl Lee Gallo's sister, worked for United Taxi, Inc. as a dispatcher and served as a source of methamphetamine for other dealers. It was further established that Wilson distributed the substance herself and stored large quantities of cocaine for Carl Lee Gallo at her home.

Following their convictions, appellants filed post-trial motions to set aside the verdicts and for entry of judgments of acquittal or for a new trial, alleging, *inter alia,* violations of the Jencks Act, 18 U.S.C. § 3500, and violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The trial judge denied the motions, and this appeal followed.

## II.

Appellants contend that Assistant United States Attorney Jividen was an unauthorized person to appear before the grand jury, in violation of Fed.R.Crim.P. 6(d).[4] They also maintain that Jividen's appear-

---

**4.** Rule 6(d) provides the following:

**Who May Be Present.** Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting.

ances before the grand jury and his participation in the investigation, indictment, and prosecution of this case were *per se* prejudicial. Appellants further claim that the district court erred in denying their motions for a new trial, based on alleged violations of the Jencks Act, and in holding that the government did not violate *Brady* or *Giglio*.

In addition, Schell argues that the district court erred in ruling that his conviction was not barred by double jeopardy. He also asserts that there was insufficient evidence to sustain his convictions under RICO and the Travel Act. Finally, appellants contend that the district court erred in denying their motions for severance.

■■■ Turning first to the matter of Jividen's participation, we reject appellants' argument that Jividen was an unauthorized person to appear before the grand jury, in violation of Fed.R.Crim.P. 6(d). As an Assistant United States Attorney, Jividen was expressly authorized by the Rule to appear before the grand jury. The purpose of Rule 6(d) is to exclude from grand jury proceedings those individuals who have no authorized role in such proceedings. There is nothing in the plain language of the Rule or in its legislative history to indicate that it was intended to prevent attorneys who have represented defendants from later serving as government counsel in cases in which those defendants are prosecuted. Certainly, Rule 6(d) does not prohibit such conduct as a matter of law.

■■ We conclude, however, that Jividen's participation in the Gallo case was *per se* prejudicial as to Wilson and Cain, whose convictions we reverse. We find no evidence of prejudice with respect to Schell and Stevens and we, therefore, affirm their convictions.

■■ The relationship between an attorney and his client is a sacred one. In that relationship, the client must be secure in the knowledge that any information he reveals to counsel will remain confidential.

The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal prosecution of that client *with respect to the identical matter about which the attorney originally counseled the client.* Such switching of sides is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances.

The government urges us to hold that no conflict of interest, impropriety, or appearance of impropriety arose out of Jividen's participation in the Gallo case. It asserts that throughout the entire course of the investigation, the cases against Carl Lee Gallo and other individuals were each investigated as separate cases, making it possible for Jividen to recuse himself from participating against his former clients. According to the government, decisions as to how the indictment should be drafted, who should be joined as coconspirators, and how various defendants should be charged were made by United States Attorney William A. Kolibash, Special Agent Larry Mincks, and the case attorney, Assistant United States Attorney Harold F. Salsbery, Jr. The government contends that Jividen was not a party to these discussions; that he had no input into the prosecutorial decisions with respect to any of the defendants named in the Gallo indictment; that he did not present the indictment to the grand jury; and that he was not present during the indictment's presentment. It further maintains that Jividen did not possess any confidential information with respect to his former clients.

Assuming that all of the government's assertions are true, the fact remains that Jividen represented Wilson and Cain with respect to the very same criminal activity which led to the indictment that he ultimately helped to prosecute and under which Wilson and Cain were convicted.[5]

---

5. In this respect, the instant case is distinguishable from the authority the government relies

upon for its argument, *United States v. Grande*, 620 F.2d 1026 (4th Cir.), *cert. denied*, 449 U.S.

Moreover, although the government attempted to screen Jividen from any direct involvement in the cases against his former clients, the effectiveness of that insulation is questionable, especially in light of the fact that Jividen posed questions to certain grand jury witnesses concerning his former clients. For example, Jividen elicited from grand jury witness Marty Lopez that Lopez knew John Cain; that he had never witnessed an act of violence by Cain; that he had seen Cain involved in a bar fight on one occasion; that he had seen Cain carry weapons, including a revolver; and that he had never seen Cain pull a gun on anyone. He questioned witness Stephen Southern as to whether he knew John Cain and whether he had ever seen John Cain at Carl Lee Gallo's house or strip mining operation. Jividen further questioned Southern concerning whether Southern had seen John Wilson at Freda Wilson's house; whether John Wilson lived with Freda Wilson; who else lived with Freda Wilson; and the position of Freda Wilson's house in relation to Carl Lee Gallo's house. According to appellants, Jividen also questioned grand jury witnesses Russell Taylor, James Post, Ernest Grandinetti, and Deborah Swiger about Freda Wilson.

■ We conclude that due process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter. Because Jividen represented Wilson and Cain concerning the very matter about which he later helped to prosecute and convict them, we are compelled to reverse

their convictions and dismiss the indictment as to them.[6] On the other hand, Jividen did not serve as counsel to appellants Schell and Stevens. Thus, no attorney-client relationship existed between them. Furthermore, there is no evidence that Schell and Stevens were in privy with Wilson and Cain or that Wilson and Cain imparted to Jividen any confidential information regarding Schell and Stevens. We, therefore, hold that neither Schell nor Stevens has demonstrated any prejudice as a result of Jividen's participation in this case which would require reversal of their convictions. See United States v. Caggiano, 660 F.2d 184, 190–91 (6th Cir.1981), cert. denied, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 303 (1982); Gajewski v. United States, 321 F.2d 261, 267–68 (8th Cir.1963).

### III.

Schell, Cain, Stevens, and Wilson maintain that the district court erred in denying their motions for a new trial based on alleged violations of the Jencks Act, and in holding that the government did not violate Brady or Giglio. We disagree.

The Jencks Act material which appellants claim they were not given consisted of: (1) a letter to Jividen from Anthony Alvino, an indicted coconspirator turned government witness, regarding Alvino's cooperation; and (2) Lindsey's grand jury testimony. Appellants contend that Alvino's letter would have enabled them to impeach Alvino, and that Lindsey's grand jury testimony would have been useful in their cross-examination of Lindsey concerning her

---

830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). In *Grande,* we found no evidence of an appearance of impropriety as a result of a United States Attorney's involvement in a case in which an unindicted coconspirator and important government witness had been a client of a law firm for which the United States Attorney had previously worked. Here, not only did Jividen represent Wilson and Cain with respect to their grand jury testimony, but Wilson and Cain were indicted and convicted and Jividen was one of the government attorneys who assisted in the prosecution of the case.

The present case is, likewise, distinguishable from a situation in which counsel for the prose-

cution had previously represented the defendant with respect to a completely unrelated matter. See Gajewski v. United States, 321 F.2d 261, 267 (8th Cir.1963).

**6.** We do not view reversal of Wilson's and Cain's convictions as precluding the government from seeking to reindict them. Forman v. United States, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960); United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); United States v. Hayes, 676 F.2d 1359 (11th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982).

memory problems stemming from her use of medication. They further maintain that both documents would have helped them establish a case of prosecutorial misconduct with respect to Jividen.

■ Jencks Act violations constitute harmless error when they result in no prejudice to the defense. *United States v. Crowell,* 586 F.2d 1020, 1028 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979). We find no evidence of prejudice to appellants' defense as a result of the government's failure to provide them with Alvino's letter. There is no information contained in the letter which implicates appellants or which could be viewed as showing prosecutorial misconduct on the part of Jividen. Therefore, we conclude that the failure of the government to provide appellants with Alvino's letter, if error at all, was harmless error.

■ With respect to Lindsey's grand jury testimony, although it was not given to defense counsel, the substance of her testimony was disclosed in one page of a forty-nine page statement which was turned over to appellants' attorneys. On page twenty-eight of that statement, Lindsey said that she appeared before the grand jury, invoked her fifth amendment privilege against self-incrimination on some of the questions, and discussed her health conditions with the grand jury. At trial, upon direct examination, Lindsey testified that she used methamphetamine and sold methamphetamine for Freda Wilson. Additionally, defense counsel elicited from Lindsey that she had used marijuana and quaaludes. Counsel knew from the previously-disclosed statement that Lindsey had health problems, but they elected not to explore that avenue of cross-examination. Finally, Lindsey made no mention of appellants in her grand jury testimony, and her testimony was devoid of any information which would have helped appellants show prosecutorial misconduct. Based on these facts, we hold that any error due to the government's failure to provide appellants with Lindsey's grand jury testimony was harmless.

Appellants also argue that the government violated *Brady* and *Giglio* by failing to disclose the following: (1) certain letters between Anthony Alvino and Jividen concerning Alvino's plea bargain agreement; (2) the original copy of Lindsey's plea bargain agreement, which was signed by Jividen;[7] and (3) certain grand jury testimony during which Jividen asked grand jury witnesses questions about his former clients.[8] Appellants claim that the Alvino-Jividen letters show that Alvino was given promises of leniency in return for serving as a government witness. Appellants further contend that had they been provided the Alvino-Jividen letters, Lindsey's original plea bargain agreement and the portions of grand jury testimony in which Jividen asked questions about his former clients, they could have shown an improper involvement of Jividen in the prosecution of his former clients and their coconspirators, which would have affected the judgment of the jury.

■ We conclude that the failure of the government to provide appellants with the Alvino-Jividen letters and the original signature page of Lindsey's plea agreement, if error at all, was harmless error. Upon direct examination of Alvino, the government elicited the fact that Alvino was testifying pursuant to a plea agreement, and one of the appellants' attorneys cross-examined Alvino as to his motivation for testifying. Additionally, Alvino's testimony was corroborated by the testimony of

7. Throughout their brief, appellants make reference to the fact that Lindsey's plea agreement was originally signed by Assistant United States Attorney Jividen, who had represented her while he was in private practice, and that the signature page was later re-typed and signed by another Assistant United States Attorney. The government explains that Jividen did not negotiate the plea bargain. According to the government, the plea bargain agreement was inadvertently given to Jividen for his signature, and a new signature page was later prepared with the knowledge and concurrence of Lindsey and her attorney.

8. *See supra* p. 566.

three other witnesses. Moreover, neither the Alvino-Jividen letters nor the original signature page of the Lindsey plea bargain agreement would have exculpated the appellants. Thus, they would not have affected the outcome of the trial and we conclude their non-disclosure constituted, at most, harmless error. *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In addition, we hold that the government was not required under *Brady* to disclose the grand jury testimony at issue, because it neither impeached nor exculpated appellants. *See id.*

## IV.

Schell further contends that his conviction was barred by double jeopardy due to his previous New Jersey conspiracy conviction, and that there was insufficient evidence to support his RICO and Travel Act convictions. These claims are meritless.

In the New Jersey case, Schell had been charged and convicted in federal district court of, inter alia, conspiring with others to: (1) knowingly and intentionally manufacture phenyl-2-propanone (the principal ingredient in methamphetamine) and methamphetamine, Schedule II controlled substances, and (2) knowingly and intentionally possessing, with the intent to distribute, methamphetamine, a Schedule II controlled substance, both in violation of 21 U.S.C. § 846. In the present case, Schell was indicted under eleven of the 344 counts of the indictment. Count 1 charged a substantive violation of RICO, 18 U.S.C. § 1962(c). Count 2 was a RICO conspiracy charge, in violation of 18 U.S.C. § 1962(d). Counts 71, 72, 90, 91, 105, 106, 224, and 225 charged violations of 18 U.S.C. §§ 1952 and 2, aiding and abetting interstate travel in aid of racketeering, and Count 333 charged a conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846. Schell moved before, during, and after trial to dismiss the indictment on the ground that he had previously been convicted for his participation in the conspiracy and the sale of methamphetamines and, therefore, had been placed in double jeopardy in the instant action. Before trial, the district court granted Schell's motion as to Count 333, conspiracy to distribute methamphetamine, but it denied the motion regarding the other counts. At the end of the government's case, the trial court dismissed Counts 90 and 91 of the indictment. After hearing the remaining evidence, the jury acquitted Schell on Counts 72, 106, 224 and 225 and convicted him on Counts 1, 2, 71, and 105.

With respect to the RICO conspiracy charge against Schell in the instant case, the government was required to show the existence of an enterprise and an overt act in order to sustain a conviction under the RICO statute. *See* 18 U.S.C. § 1962; *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Unlike the RICO conspiracy charge in the present case, under the indictment in the New Jersey case all that needed to be proved was an agreement between Schell and another to commit a narcotics offense. *See* 21 U.S.C. § 846. Because the RICO conspiracy charge and the New Jersey conspiracy charge required proof of conspiracies which were different and violated different statutes, we conclude that Schell was not subjected to double jeopardy with respect to the RICO conspiracy charge. *Albernaz v. United States*, 450 U.S. 333, 339, 101 S.Ct. 1137, 1142, 67 L.Ed.2d 275 (1981). Likewise, we determine that Schell's New Jersey conviction did not bar his prosecution and subsequent conviction on the substantive RICO charge (Count 1) or on the Travel Act charges (Counts 71 and 105). *See United States v. Bayer*, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947).

We also reject the claim that there was insufficient evidence to sustain Schell's convictions under RICO and the Travel Act. Evidence introduced at trial, when viewed in the light most favorable to the government, established that Schell was a member of the RICO enterprise and possessed a common purpose with other codefendants. By supplying John Gallo with pound quantities of methamphetamine

for redistribution in Clarksburg, West Virginia, Schell became a willing member of the RICO enterprise. The mere fact that Schell did not know every other member of the enterprise or have actual knowledge of their activities is irrelevant. To sustain his RICO conviction, it is sufficient that he knew the existence of the enterprise and that the scope of the enterprise extended beyond his individual role as supplier. *See United States v. Elliott*, 571 F.2d 880, 901 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

With respect to the Travel Act counts, the testimony at trial established that Schell caused and aided and abetted the travel of John Gallo and other Gallo organization members from Clarksburg, West Virginia, to Bristol, Pennsylvania, in order to sell John Gallo large amounts of methamphetamine for redistribution in the Northern District of West Virginia. The testimony further revealed that Schell instructed certain Gallo organization members to travel to Bristol, to get a motel room, and to contact him to complete the transactions. Such activity clearly violates the sections of the Travel Act under which Schell was charged. *See* 18 U.S.C. §§ 1952(a)(3) and 2.

### V.

Finally, appellants argue that the district court erred in denying their motions for severance.[9] Appellants claim that the indictment was unwieldy and unnecessarily joined multiple defendants and multiple conspiracies. They also maintain that the district court's failure to grant severance resulted in spillover prejudice, because the jury was unable to consider individually each offense and each defendant. We see no merit in these contentions.

 There was nothing improper about the inclusion of multiple defendants and multiple crimes of the RICO enterprise in the indictment in this case. Under the RICO statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, unrelated crimes, as long as each crime was intended to further the affairs of the enterprise. *United States v. Elliott*, 571 F.2d at 902–03.

 We also find no abuse of discretion on the part of the district court in its denial of the motions for severance. Before trial, the district court granted a trial management motion by the government, ordering that Schell, Cain, Stevens, and Wilson be tried separately from the other individuals charged in the indictment. At trial, the district judge adequately cautioned the jury to render individual guilt determinations. He gave such cautionary instructions on three separate occasions: in his preliminary instructions, during trial, and during his final charge to the jury. Moreover, the jury verdict itself, acquitting the defendants on some charges and finding them guilty on others, demonstrates that the jurors individualized their determinations of guilt as to each defendant and returned a fair verdict based on the evidence against each defendant. *See United States v. Lurz*, 666 F.2d 69, 80 (4th Cir.1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982); 457 U.S. 1136, 102 S.Ct. 2966, 73 L.Ed.2d 1354 (1982); 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982).

### VI.

On the basis of the foregoing, the judgment of the district court with respect to Schell and Stevens is affirmed, and the district court's judgment as to Cain and Wilson is reversed and the indictment as to them is dismissed.

AFFIRMED IN PART and REVERSED IN PART.

---

9. All four appellants contend that the district court erred in denying their motions for severance. However, the record does not reflect that Wilson filed such a motion.