**UNITED STATES of America, Plaintiff,**

v.

**Steven M. MARSHANK, Defendant.**

**No. CR–90–0400 MHP.**

United States District Court,
N.D. California.

Nov. 5, 1991.

Jonathan Howden, Asst. U.S. Atty., Drug Enforcement Task Force, San Francisco, Cal., for plaintiff.

Marcus S. Topel, William M. Goodman, Daniel F. Cook, Topel & Goodman, San Francisco, Cal., for defendant.

## OPINION

PATEL, District Judge.

On July 26, 1990, defendant Steven M. Marshank and two co-defendants were indicted and charged with federal statutory violations related to their alleged membership in an organization which imported large amounts of hashish and marijuana into the United States.[1] Marshank brings this motion to dismiss the indictment against him, alleging that the United States government ("government") violated his Sixth Amendment right to counsel and Fifth Amendment right to due process. Specifically, Marshank alleges that throughout the investigation of his case, his former attorney, Ronald Minkin, had an ongoing relationship with government agents from various federal law enforcement agencies and the Assistant United States Attorneys ("AUSA") assigned to his case. Marshank alleges that these agents and AUSAs, with full knowledge that Minkin was defendant's attorney, encouraged Minkin to actively aid the government's investigation of the defendant. Marshank further maintains that the government exploited the information they received from Minkin to arrest and prosecute him. This complicity, Marshank contends, occurred throughout the course of the investigation which led to a 1987 indictment of defendant, subsequently dismissed by the government, and continued during the investigation leading to the instant indictment.

After reviewing the arguments and submissions of the parties, the court found that further evidence was necessary in order to rule on the motion to dismiss and held an evidentiary hearing pursuant to Federal Rule of Evidence 611. The following witnesses testified at the hearing: 1) Ronald Minkin, the defendant's former attorney; 2) Peter Robinson, the AUSA assigned to defendant's case in 1987; 3) Lee C. Rasmussen, an F.B.I. agent who worked in the narcotics unit of the Organized Crime Division in Los Angeles from 1982 through January 1990;[2] 4) Edward Ames, a U.S. Customs agent in San Francisco; 5) Seth R. Booky, a former associate of Marshank who was indicted for drug trafficking in 1987;[3] 6) Robert Heng, a special agent with the Drug Enforcement Administration; and 7) Wayne N. Yamashita, a special agent with the U.S. Customs Service in San Francisco.[4]

In addition to the parties' moving papers and the testimony presented at the hearing,

---

1. Defendant and co-defendants Alan Julius Lobel and Robert Turner were charged with violations of the following statutes: 21 U.S.C. § 848 (Continuing Criminal Enterprise); 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Hashish and Marijuana); 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Hashish) (two counts); 18 U.S.C. § 1952(a)(3) (Interstate Travel in Furtherance of Drug Trafficking) (two counts); and 18 U.S.C. § 2 (Aiding and Abetting).

2. Rasmussen is an attorney and has been a member of the Utah Bar since 1987.

3. Booky became an active informant for the government and provided information leading to both the 1987 and the current indictment against Marshank. Minkin is Booky's attorney. AUSA Robinson was the prosecutor assigned to Booky's case.

4. Yamashita was Agent Ames' supervisor beginning in early July 1987 and continuing throughout the investigation of the defendant.

the agents submitted declarations. The government, pursuant to the court's discovery order, turned over numerous documents, including internal agency memoranda, agents' notes of meetings among themselves and with Minkin, and notes of telephone conversations between various agents and Minkin.

FINDINGS OF FACT

Taken together, the hearing testimony, the discovery material and the parties' moving papers tell the shocking tale of a criminal defense attorney who was oblivious to the professional norms of ethical behavior and a cast of overzealous government agents and prosecutors who facilitated the attorney's unethical conduct in an attempt to catch "a big fish." Most of the facts are substantially undisputed; some of them are in sharp dispute. The following narrative embodies the court's findings of fact.

The story began in 1986 when Ronald Minkin, a criminal defense attorney, approached AUSA James Walsh in Los Angeles on behalf of two clients, Gary Crawford and Gary Ohlgart. Although Crawford and Ohlgart had never been indicted and were not at that time under investigation, they wished to dissociate themselves from the drug business by providing information to the government in exchange for immunity from prosecution, complete anonymity and the promise that they would never have to testify in court. RT at 1–24. Minkin arranged a deal under these terms, on behalf of Crawford and Ohlgart, with AUSA James Walsh. Def.Ex. A.

In August 1986 several agents, including F.B.I. agent Lee Rasmussen, debriefed Crawford and Ohlgart in Los Angeles. RT at 2–399. Minkin was present at this meeting. RT at 2–399–400. Crawford, Ohlgart and Minkin provided information about suspects in a major marijuana and hashish smuggling operation. RT at 2–402. Those suspects included several of Minkin's former and present clients, among them Stephen Marshank, Seth Booky, and Robert Wehe. Minkin's Los Angeles law firm had represented Marshank in a divorce proceeding in 1982 and 1983, Def.Ex. Z, and Minkin

had personally represented Seth Booky on a drug-related charge in Hawaii in 1983. RT at 3–660. Both Marshank and Booky had ongoing attorney-client relationships with Minkin. Minkin, Crawford and Ohlgart made a diagram which sketched out the relationships among the various individuals they named. The defendant's name appeared on the chart, which came to be known as "the matrix." Def.Ex. 1.

On February 5 and 6, 1987, another meeting was held in Los Angeles. This meeting was attended by members of the Organized Crime Drug Enforcement Task Force ("OCDETF"), DEA agents, United States Customs agents from San Francisco and Los Angeles and three Assistant United States Attorneys. A task force was formed to develop a plan of action which would lead to the indictment of Booky, and then with Booky's cooperation, to the indictment of Marshank. The task force included various agents from Los Angeles and San Francisco, including Ames and Rasmussen. Def.Ex. P; RT at 2–416. It was determined at this meeting that because Crawford and Ohlgart had been promised that they would not have to testify, an "inside individual" would be needed for the government to pursue the plan. RT at 2–404–05.

The agents initially decided to target Robert Wehe, who was already the subject of a sealed indictment, for the "inside individual" role. RT at 2–405. Ron Minkin had represented Wehe in the past, *id.*, and Wehe was chosen because Minkin told the agents that he [Minkin] could "bring him in." RT at 2–412. Minkin contacted Wehe and mediated an agreement between Wehe and the government in which Wehe agreed to surrender and cooperate with the government. Def.Ex. D at 2. After his arrest while represented by Minkin, Wehe provided information about the defendant to the government. RT at 3–578.

It eventually became apparent to the government that Wehe had a drinking problem which made him an unreliable active informant. RT at 2–420. The government then shifted its focus to Seth Booky, another of Minkin's former clients who had

been named by Minkin, Crawford and Ohlgart. The plan was to indict Booky on a historical conspiracy charge. RT at 2–419. Booky would then cooperate with the government, "wear a wire, make telephone calls and provide the necessary 'active' work based upon the intelligence information" provided by Crawford and Ohlgart. Def.Ex. P at 2. Marshank would be one of the major targets of the investigation. Def.Ex. P at 2; RT at 2–315, 2–425, 3–583.

Minkin informed the government agents that he had represented Booky in Hawaii in 1983 and that Booky would be likely to cooperate. RT at 2–419–21. The plan to elicit Booky's cooperation in exchange for a plea agreement, RT at 2–421–22, changed in May 1987 when Minkin called Agent Ames and informed him that Booky was involved in a large marijuana deal. RT at 3–562. Ames testified that at the time he received the telephone call from Minkin he was aware that Minkin had represented Booky in the past. RT at 3–562.

Based upon Minkin's information, AUSA Robinson authorized the arrest of Booky. On Memorial Day 1987, Agent Ames and the Sonoma County Sheriff's Department arrested nine individuals, including Booky, for the sale of one thousand five hundred pounds of marijuana. Ames Decl. at 6. Agent Ames never informed Booky that Minkin was the person who provided the government with the information leading to his arrest. RT at 3–565.

Although there are some inconsistencies in the testimony of the various witnesses, it is clear that prior to Booky's arrest the government agents and the AUSAs on the case were aware that Minkin had repre-

sented Booky in the past and would probably represent him after he was arrested. AUSA Robinson, for example, stated that he "understood from Ames that Minkin had represented Seth Booky in the past and would likely initially represent Booky" after his arrest. Robinson Decl. ¶ 8. Booky himself had considered Minkin to be his attorney since 1983. RT at 3–686.

The government also knew that Minkin had provided the information that led to Booky's arrest either directly or by relaying information from Crawford and Ohlgart. RT at 3–586. While AUSA Robinson denies that he knew at the time that the information leading to the arrest of Booky had been supplied by Booky's own lawyer, he concedes that he was aware that incriminating information concerning Booky had come from Crawford and Ohlgart, whom he knew were represented by Minkin. RT at 2–277. Robinson admits that he was aware that this situation represented a serious conflict of interest. RT at 2–278–79. Agent Ames testified that he told Robinson at the time of Booky's arrest that he [Ames] had received the information leading to Booky's arrest directly from Minkin. RT at 3–586.[5]

After Booky's arrest, Robinson and Ames met with Booky in the Marin County Jail. The agents told him that they were willing to work out a deal whereby he would be awarded a percentage of the property forfeited as a result of his assistance. RT at 3–650–51. Booky contacted Minkin, who instructed his client "in an extremely urgent way" to cooperate with the government. RT at 3–652.[6] Minkin

---

5. There are other discrepancies between the testimony of Robinson and Ames. For instance, Robinson testified that he did not know about the task force formed in Los Angeles to investigate the defendant or of the plan to use Booky as an active informant. RT at 2–312–313, 319–321. Ames, however, testified that he told Robinson of the task force that was formed at the Los Angeles meetings. RT at 3–589. It is clear that either Ames or Robinson is not telling the truth.

The court is hard pressed to believe that Ames, the case agent, would not have informed Robinson, the AUSA in charge of the case, of such important developments in the case. How-

ever, given that either version of the story reveals government complicity with Minkin, it unnecessary for the court to resolve the conflict between the witnesses' testimony.

6. Booky, in his testimony before the second grand jury to indict Marshank, described the moments after his arrest and leading up to his decision to cooperate with the government as follows:

And they took us up to the Santa Rosa Courthouse, down to the police station down there, and everybody was in separate rooms. . . . .

then negotiated a settlement of the case, including cooperation, with Robinson. RT at 2–274–75.

Robinson never raised the issue of conflict of interest with Minkin or Booky during the plea negotiations although he was aware that Minkin's clients, Crawford and Ohlgart, acting under a cooperation agreement negotiated by Minkin, had provided the information leading to Booky's arrest. RT at 2–280. Nor did Robinson ever raise the issue of conflict of interest with the court. RT at 2–285.

Subsequently, Booky entered into a representation agreement with Minkin which guaranteed Minkin one third of all sums the government paid to Booky as a result of his cooperation. This included any mo-

nies Booky might receive for information leading to forfeiture of property.[7] Def. Ex.H. Although Minkin continued to represent Booky, Booky's attorney of record was Vincent Oliver, who rented space in Minkin's law office. Oliver acted as a "front attorney." RT at 3–577. Both Robinson and Ames were aware that Minkin actually represented Booky. RT at 2–284, 3–577. The only court appearance Minkin made for Booky was at his sentencing on January 29, 1988. RT at 2–285.

During the time between Booky's arrest on May 31, 1987 and Marshank's indictment on September 16, 1987, the task force investigation centered on Marshank and Daniel Hartog, who was suspected of running a large scale marijuana and hashish

And they come in, close the door, and say, "Hello, Mr. Booky, I'm Ed Ames and I'm Peter Robinson.

They said "We would like your help, Mr. Booky. We have this case dead to rights, but we know who you are, and we'd like your help. We'd like your cooperation, and you could make it easy on yourself if you help us now."

They said, "We're looking for forfeitures and there's a reward to be had and we're willing to offer those to you if you make a deal right now. We want your cooperation."

I said, "Look, I have to talk to my lawyer."

I said, "I'm not gonna say anything to you guys before I talk to my lawyer."

So I thought that I'd get on the phone to my lawyer. His name's Ron Minkin.

And I thought he'd tell me, "Seth, don't say anything."

Because that's what he told me before, because that's what he told me in Hawaii, and that's the general procedure.

. . . .

But I get on the phone to Ron, and he says, "Seth," he says, "look, there's a lot you don't know."

He says, "I know a lot you don't know, but I gotta tell you, you're in big trouble and you got no choice."

He says, "Seth, your life is over."

He says, "You've got to cooperate with the government."

Now this came to me—I'm saying, "What?"

I know this guy. He's a lawyer. He's a criminal defense lawyer.

. . . .

I says, "What are you talking about?"

He says, "Don't ask me."

He says, "As a friend and as your lawyer, you have no choice."

And I said, "But, Ron, I only got caught—I only got 15 pounds in the car."

He says, "Seth, you got no choice. You've gotta make up your mind right now."

From the tone of his voice, there was more to it than I knew. There was just more to it.

And knowing him as being a friend, I knew he cared about me personally, other than a lawyer/client relationship.

He just left me with no options. And right then and there, I made up my mind.

"Yeah," he says, "look"—

Ron says to me, he says, "Look, Seth, I'll make you the best deal I can."

He says, "There's rewards that you can have if you lead these guys to forfeitures."

He says, "You won't do any time."

He says it like he already had made this deal. And I—

So he says, "Let me talk to those guys," meaning Ames and Robinson.

So he gets on the phone with Ames and Robinson, and I hear half the conversations, you know. You know, I coudn't [sic] hear Ron, but I could hear their end.

Actually, I heard Ames say, "Yeah, there's rewards, yeah, Ron," like he knew Ron, which, you know, I didn't know what was going on.

Then I hear him talking to Robinson.

"Yeah, Ron, yeah, we'll get him out Monday, him and Moffett."

. . . .

And Ron says, "But you got to cooperate with these guys. You've gotta help them. Seth, tell them everything you know."

Grand Jury Proceedings, Testimony of Seth Booky, March 15, 1990, at 298–32.

7. Minkin and Booky have brought an action against the government for monies to which they claim they are entitled as a result of Booky's cooperation in the Marshank investigation and the representation agreement between Booky and Minkin. RT at 3–657.

smuggling operation. With Minkin's assistance, the government used Booky to investigate both Hartog and Marshank. Booky was "wired" to record conversations with Marshank and engaged in other "active work" on the government's behalf. RT at 3–530. The government used Booky in this capacity, knowing full well that Booky's lawyer, Minkin, represented: 1) Crawford and Ohlgart, who had provided incriminating information about Booky and Marshank; 2) Bobby Wehe, who had provided incriminating information about Booky and Marshank; and 3) Booky himself, who was actively obtaining and providing incriminating information about Marshank. RT at 2–269, 3–530. In addition, Minkin told the government that he was likely to represent Marshank and that Marshank was likely to cooperate with the government. RT at 2–269.

Booky eventually entered the Federal Witness Protection Program. Prior to that time the government's only access to Booky was through Minkin. Booky was hidden by Minkin and only Minkin knew his location. RT at 3–758. The government thus benefitted from Minkin's role as a conduit between Booky and the government agents and AUSAs. RT at 3–759.

After Booky's arrest, the government agents believed that in order for Booky to remain a viable active informant, he would have to convince his confederates that he had not "rolled over" and was still fighting the prosecution of his case. Minkin, Booky and Agent Ames agreed that Booky should act as if he were not cooperating with the government and as if Minkin were defending him. RT at 3–569. During the summer of 1987 Booky began to put pressure on his confederates, including Marshank, to pay for his supposed defense and to provide him with living expenses. *See* Heng Decl., Exs. B, C, E. Marshank paid ten thousand dollars to Minkin for Booky's defense and expenses. RT at 3–596. Booky ostensibly requested the payment to con-

vince his confederates that he had not become a government informant. RT at 3–576.

The government was aware that Booky was pressuring Marshank for money to pay Minkin's fees. Booky had several phone conversations with Marshank in which he indicated that he needed money to pay Minkin for his defense. These phone conversations were recorded by the government. Heng Decl., Exs. C at 5–8, Ex. E. Agent Ames testified that he told Robinson about the payment of money by Marshank to Minkin, RT at 3–587–88, 3–598, and that Robinson must have been aware of the payments because in the summer of 1987 he was the AUSA on the case and was aware of the contents of the taped Booky phone conversations. RT at 3–528.[8] The government, however, allowed both Booky and Minkin to keep the money. None of the money paid to Booky and Minkin was ever seized. RT at 3–596–98. The government subsequently used the payment of Minkin's fees as evidence against Marshank in the second grand jury proceeding against him. RT 3–673.

During the time between Booky's arrest and the defendant's indictment, Booky received over twenty thousand dollars from various sources. RT at 3–645. Minkin received ten thousand dollars from Marshank for Booky's ostensible defense. Grand Jury Proceedings, Testimony of Ronald Minkin, June 28, 1990, at 27–28. Minkin testified that he gave half of that sum to Oliver and returned the other half to Booky for living expenses. RT at 1–186.

In the summer of 1987 it became clear to the government that Booky was suspected by his confederates. Booky reported that he was finding it difficult to get close to Hartog. RT at 3–677. Robinson, Ames and Yamashita decided to use the information provided by Booky and Minkin to indict Marshank on a historical conspiracy charge in the hopes that Marshank would then

8. Contrary to the testimony of Agent Ames, Robinson testified that he did not know that the defendant provided money to Minkin for Booky's ostensible defense. The former AUSA testified that had he known about the funds he

would not have allowed Minkin to keep the money. For the same reasons stated in Note five, the court need not resolve this conflicting testimony. RT at 2–296–297.

provide information about a thirty-five ton shipment of marijuana, known as the "Hartog Load", that was allegedly being shipped from Thailand. Def.Ex. P at 2–3; RT at 2–346.

During the 1987 pre-indictment investigation of Marshank, then–AUSA Robinson knew that Minkin was representing Marshank. RT at 2–269, 2–323–24. Robinson also knew that Minkin had told Agent Ames that Marshank would probably cooperate with the government because Minkin had been Marshank's lawyer previously. RT at 2–328, 2–350. In addition, Robinson was aware that the government would use information from Minkin's other clients to indict Marshank. RT at 2–333. Minkin's role, assigned to him by the government, was to encourage and bring about Marshank's cooperation. RT at 2–324.

After the decision was made to indict and arrest Marshank, the grand jury heard testimony from several witnesses. All of the witnesses who provided testimony against Marshank were clients of Ron Minkin. RT at 2–272. The grand jury witnesses were Seth Booky, Robert Wehe, and a government agent who summarized a statement taken from David Vandrell, another of Minkin's clients. RT at 2–270, 2–352.

Although the government was ready to arrest Marshank following his indictment on September 16, 1987, his whereabouts were unknown. RT at 3–535. Agent Ames called Agent Rasmussen, who gave Minkin's telephone number to Ames. RT at 2–496. Ames then phoned Minkin. Minkin made inquiries to determine where Marshank was, RT 1–61–62, informed Ames that the defendant was in Florida, and provided the agent with Marshank's exact location. RT at 3–535.

Acting upon the information provided by Minkin, Ames flew to Florida, found Marshank and arrested him on October 2, 1987. RT at 3–536. By the time of the defendant's arrest, Agent Ames and AUSA Robinson knew that Minkin was representing Booky, RT at 3–527, and that Booky and Minkin had provided the government with the information leading to Marshank's arrest. RT at 3–528.

Agent Ames stated that after he arrested Marshank he read the defendant his *Miranda* rights and then suggested that he call legal counsel. Ames provided Marshank with a telephone to make the call. Ames Decl. 9:16–21; RT at 3–536–38. Agent Yamashita testified that it is highly unusual for a government agent to suggest that a suspect contact legal counsel upon making an arrest and that the standard procedure for Customs agents is to avoid any mention of attorneys after suspects are given the *Miranda* warning so as not to damage the possibility of obtaining an interview with the suspect. RT at 3–723–24. This, obviously, was not a concern of Agent Ames in this case. As expected, Marshank called Minkin. RT at 3–537.

Minkin flew to Florida to represent Marshank. RT at 3–538; Def.Ex. L. Agent Rasmussen testified that both Ames and Minkin called him either from Florida or immediately before they went to Florida; thus, Minkin conferred with the government before meeting with his client. RT at 2–441. By this time Rasmussen was aware that Minkin represented Booky, RT at 2–444, and that Minkin was going to Florida on business involving Marshank. *Id.*

In Florida, Agent Ames met first with Minkin and then with Minkin and Marshank. RT at 3–530–31. Ames never informed Marshank that Minkin had provided the government with information concerning Marshank's whereabouts or that Minkin and his clients had supplied the government with the information that led to Marshank's indictment and arrest. RT at 3–553–54. The meeting between Ames, Minkin and Marshank was off the record for the most part. Minkin, however, did recommend to the defendant that he disclose on the record the existence of two false passports. RT at 3–532. Minkin told Ames that he would put the passport discussion on the record as a "sign of good faith." Ames Decl. at 11. At a bail hearing the following week, Marshank's admission was used by the government to argue for detention of the defendant without bail. RT at 3–532. Ames had no knowledge of

the passports before learning about them from Minkin. RT at 3–590.

Agent Ames had concerns about Minkin's ability to represent Marshank in light of their potential conflict of interest. RT at 3–524–25. The agent testified that before interviewing Marshank he called Robinson from Florida and expressed his concern about Minkin acting as the defendant's lawyer. RT at 2–526. Ames testified that Robinson told him to proceed with the arrest and to bring Marshank back to San Francisco. Robinson said they would "sort it out later," RT at 3–526–27, and did not instruct Ames to raise the issue of conflict of interest with the court, the U.S. Attorney in Florida, or with Minkin himself.[9] Ames never informed Marshank or the court of the potential conflict of interest. RT at 3–554.

Contrary to Minkin's predictions, Marshank refused to cooperate with the government following his arrest. After Marshank's arrest Minkin spoke with DEA Agent Heng. Agent Heng testified that Minkin was disappointed that his client had refused to cooperate. RT at 3–823. Minkin complained that his client was "crying hysterically" and that, rather than taking advantage of Marshank's state, Agent Ames had "dropped the ball" by putting the defendant back in jail. Def.Ex. Y; RT at 3–796, 3–823. In addition, Minkin lamented to Robinson that Agent Ames "blew it" because the agent was not "heavy enough" with Marshank. RT at 2–358–59.

Agent Ames flew with Marshank from Florida to California. RT at 3–557. During the trip Ames had conversations with Marshank about substantive matters related to Marshank's case, even though the agent was aware that Marshank was represented by counsel. RT at 3–557–60. After Marshank was returned to San Francisco, he dismissed Minkin and retained his current counsel.

Marshank's ex-wife, Jane Wechsler, stated that she called Minkin on October 6, 1987, after learning of Marshank's arrest, to see if she could be of any help. In her sworn declaration, Wechsler recounted that Minkin claimed "he was the only person who could handle Steven's case, that if Steven knew what was best he would keep Minkin as his lawyer and would cooperate with the government 'one hundred percent.'" Wechsler Aff. ¶ 6. Minkin also allegedly told Wechsler that Marshank would have to pay Minkin one million dollars and that federal agents would see to it that Marshank was able to obtain money from foreign bank accounts. Wechsler Aff. ¶ 8, 9. In addition, Wechsler contends that Minkin suggested that it would be helpful for government agents to arrest Julie Aldwell, a friend of Marshank's with whom he was purportedly involved in drug smuggling. Wechsler Aff. ¶ 18. Minkin allegedly told Wechsler that Aldwell's arrest would help Marshank "come to his senses," since Aldwell would be forced to inform on Marshank in order to save herself and Marshank would then "feel the noose tightening around his neck." *Id.*

Minkin maintained contact with government agents and provided them with substantive evidence against Marshank. The agents often took notes of their telephone conversations with Minkin. *See* Def.Ex. O and Y. Minkin often called the agents to give them information on Marshank's activities.[10] Def.Ex. Y. For example, Minkin provided information about Marshank to

---

**9.** Robinson testified that although he spoke to Ames in Florida after Marshank was arrested, the two men never discussed Minkin's potential conflict of interest. RT at 2–307. Once again, there is no need to resolve the discrepancy between the testimony of Robinson and the government agent.

**10.** The government produced notes taken by agents in conjunction with many of these calls. The notes provide information regarding the following:

1) calls by Minkin to Yamashita on October 31, 1987, November 9, 1987, November 11, 1987, November 18, 1987, November 25, 1987, January 6, 1988, and July 17, 1989. Def. Ex. O. There are also ten pages of undated notes written by Yamashita.

2) calls by Minkin to Heng on August 22, 1989 and March 19, 1990. There are also several pages of undated notes by Heng.

Agents Ames and Yamashita on numerous occasions in the months prior to Marshank's arrest in October 1987. RT at 3–583, 3–599, 3–720 3–742. In August 1987 Minkin met with Ames and Yamashita to help the agents decipher "the matrix" previously provided by Minkin, Crawford and Ohlgart and to provide the government with additional information. RT at 3–717–18.

Yamashita's notes dated October 9, 1987, one week after Marshank was arrested in Florida, indicate that Minkin called Yamashita and gave him the location of Deborah Hawkins, a witness the government was looking for in the Marshank case. Def.Ex. Y; RT at 3–743. An undated note indicates that Minkin called Yamashita and gave him the name of somebody with whom Marshank allegedly distributed cocaine. Def. Ex. Y; RT at 3–762. On yet another occasion, Minkin called Yamashita and gave the agent the name of an individual who was willing to provide the government with incriminating information concerning Marshank. RT at 3–760.

Agent Heng testified that he had at least fifteen discussions with Minkin after the attorney was fired by Marshank. RT at 3–792. During at least some of these conversations, Minkin provided Heng with information concerning Marshank. RT at 3–792.

In November 1987, FBI Agent Rasmussen met with AUSA Zanides, who had taken over the Marshank case from Peter Robinson. RT at 2–445. Zanides informed Rasmussen that he was going to dismiss the 1987 indictment against Marshank. The AUSA believed that the evidence gathered was insufficient to result in a conviction at trial and believed that Marshank had been undercharged. RT at 2–445–46; Gov. In Camera Submission, Ex. II. In a November 25, 1987 memorandum to then U.S. Attorney Joseph Russoniello ("Zanides Memorandum"), Zanides explained that the reason the case had been brought so early was because it was expected that Marshank would cooperate and provide information about the thirty-five ton Hartog load. Gov. In Camera Submission, Ex. II

at 2. While Zanides dismissed the 1987 indictment, it was his intention to re-indict Marshank after further investigation. RT at 2–446.

After the dismissal of the first indictment, the investigation of Marshank continued. In December 1987, Minkin attended a meeting with San Francisco-based government agents working on the Marshank case and introduced Crawford and Ohlgart to the agents in order to "lay the groundwork for further meetings." Def.Ex. Q; RT at 3–738–39. Agent Rasmussen had continuing contact with Minkin after Marshank's first indictment was dismissed and up through October 1990. RT at 2–473–77. Minkin called Rasmussen on various occasions to give the agent information on individuals, including Marshank, in whom the government might have an interest. RT at 2–474.

Minkin testified at the June 28, 1990 grand jury proceedings leading to the instant indictment against Marshank. In fact, Minkin did not stop providing information to the government about Marshank until after the motion to dismiss at issue here was filed and AUSA Howden, the most recent prosecutor assigned to the case, instructed government agents not to have any more contact with the defendant's former attorney. RT at 2–477, 3–810.

## DISCUSSION

The defendant argues that the indictment against him must be dismissed because the government engaged in prosecutorial misconduct which violated his Fifth Amendment right to due process and Sixth Amendment right to assistance of counsel.

## I. Fifth Amendment

▆ While application of the Sixth Amendment is limited to government action which occurs after the initiation of adverse criminal proceedings, a defendant's remedy for prosecutorial misconduct in the pre-indictment stage is provided in the due process protections of the Fifth Amendment. *United States v. Marion*, 404 U.S. 307, 315, 92 S.Ct. 455, 460, 30 L.Ed.2d 468 (1971); *United States v. Simmons*, 536 F.2d 827, 830 n. 9 (9th Cir.1976). Depend-

ing on when it occurs, government misconduct which subverts a defendant's relationship with his client may be judged under the standards of both the Fifth and the Sixth Amendments. A Fifth Amendment due process violation may occur when government interference in an attorney-client relationship results in ineffective assistance of counsel or when the government engages in outrageous misconduct.

A. *Ineffective Assistance Of Counsel*

█ When the government interferes in a defendant's relationship with his attorney to the degree that counsel's assistance is rendered ineffective, the government's misconduct may violate the defendant's Fifth Amendment right to due process as well as his Sixth Amendment right to counsel. *United States v. Irwin,* 612 F.2d 1182, 1185 (9th Cir.1980).

█ Prosecutorial misconduct constitutes a due process violation under *Irwin* only where the defendant has been prejudiced. *Id.* at 1187. The power to dismiss an indictment on due process grounds on the basis of prosecutorial misconduct should be exercised sparingly. *United States v. Busher,* 817 F.2d 1409, 1411 (9th Cir.1987). "Sparing use, of course, does not mean no use. Even 'disfavored remedies' must be used in certain situations." *United States v. Omni Int'l Corp.,* 634 F.Supp. 1414, 1438 (D.Md.1986) (citation omitted).

█ The government contends that it did nothing wrong and that the blame for any misconduct lies solely with Minkin. This court cannot agree. The government collaborated with Marshank's attorney to build a case against him, to effect his arrest, and to ensure that he would cooperate

with the government rather than contest the charges against him. Marshank was first identified as a prospective target for criminal investigation as a result of information provided to the government by Minkin and two of his other clients. The government then actively worked with Minkin to develop a case against Marshank.[11]

Government agents and AUSA Robinson used information supplied by Minkin to arrest Seth Booky, even though the government knew that Minkin had previously represented Booky and would most likely represent him on the charges which arose from Minkin's collaboration with the government. The government then used Booky as an informant to assist in the investigation of Marshank, despite the fact that the government was aware that Minkin had previously represented Marshank and would most likely represent him if he was charged with a crime as a result of the investigation in which Minkin and Booky participated.

The government's decision to use Ron Minkin and Minkin's clients to develop a case against Steven Marshank created a conflict of interest between Minkin and Marshank. The government was aware of this conflict and took advantage of it. The government did nothing to alert either the court or the defendant to the conflict of interest. It did nothing to alert Minkin, who was apparently oblivious, to any conflict. While the government may have no obligation to caution defense counsel against straying from the ethical path, it is not entitled to take advantage of conflicts of interest of which the defendant and the court are unaware.

---

11. The government attempts to distinguish the evidence provided to it by Minkin from that provided by his cooperating clients, arguing that only the former is potentially violative of the defendant's constitutional rights. However, the "fruit of the poisonous tree" doctrine applies to evidence obtained in violation of the Sixth Amendment right to counsel as well as the Fifth Amendment right to due process. *U.S. v. Terzado–Madruga,* 897 F.2d 1099, 1113 (11th Cir. 1990) (citing *U.S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Kastigar v.*

*U.S.,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). Therefore, the exclusionary doctrine applies to any incriminating evidence derived from primary evidence obtained in violation of a defendant's Fifth or Sixth Amendment rights. In light of the fact that the cooperation of Minkin's clients was a direct result of Minkin's collaboration with the government, use of evidence obtained from these government informants against Marshank must be deemed violative of the defendant's constitutional rights.

In this case, the government went so far as to participate in efforts to mask the conflict of interest from the defendant. The government was aware that Booky and Minkin solicited funds from Marshank and his associates, ostensibly to pay Booky's legal fees. Government agents taped and reviewed numerous conversations between Booky, Marshank and Marshank's associates discussing the legal fees needed for Booky's defense. Knowing that no defense was being mounted and that the legal fees were obtained by Minkin under false pretenses, the government did not seize the funds transferred from Marshank and his associates to Booky and Minkin, but allowed Minkin and his client to keep the money. Had Marshank been aware of Booky's decision to cooperate with the government, the defendant would have been alerted to Minkin's conflict of interest. Even after the defendant's arrest, the government did nothing to advise him of the conflict. Instead, the government colluded in the effort to hide the relationship between Minkin, Booky and the government by failing to inform Marshank of his attorney's role in his investigation.

Worse yet, the record makes clear that the government plotted with Minkin to ensure Marshank's arrest and then steered Marshank in Minkin's direction to guarantee his cooperation. After obtaining the indictment against Marshank, Agent Ames called Minkin, who informed the government of Marshank's whereabouts. Ames then went to Florida to arrest Marshank. Minkin consulted with Agent Rasmussen after Marshank's arrest but before speaking with his client. Upon arresting Marshank, Agent Ames departed from standard procedure and encouraged Marshank to call a lawyer, knowing that the lawyer he contacted would be Minkin, that Minkin had provided the government with the information leading to Marshank's arrest, and that Minkin would do everything in his power to deliver Marshank's cooperation to the government. Although Agent Ames expressed concern to AUSA Robinson about the conflict of interest between Marshank and Minkin, neither the agent nor the prosecutor ever made Marshank or the court aware of this conflict.

In light of the astonishing facts of this case, it is beyond question that Minkin's representation of Marshank was rendered completely ineffectual and that the government was a knowing participant in the circumstances that made the representation ineffectual. Minkin essentially turned Marshank over to the government in an effort to force him to cooperate. Indeed, as a result of the retainer agreement between Minkin and Booky, Minkin stood to gain millions of dollars if Marshank's property was seized as a result of his prosecution. Minkin's conduct during the post-arrest meeting between Marshank and the government suggests that he was attempting to worsen Marshank's position vis-a-vis the government in order to ensure that Marshank would cooperate. In this regard, Minkin advised Marshank to provide Agent Ames with incriminating information on the record and with no protection as a "sign of good faith."

It is clear to the court that Minkin's primary interest was to convince Marshank to cooperate with the government. After Marshank's arrest, Minkin attempted to engage the defendant's former wife in a scheme to "tighten the noose" around Marshank's neck and to persuade him to cooperate. When Marshank refused to cooperate, Minkin complained to Agent Rasmussen that Agent Ames had "dropped the ball" by not being "heavy enough" with Marshank.

The government's knowledge that Minkin would attempt to induce Marshank to cooperate affected the timing of the first indictment. In a November 25, 1987 memo to then U.S. Attorney Joseph Russoniello, AUSA Mark Zanides, who took over the Marshank case from AUSA Robinson, recommended that the first indictment against Marshank be dismissed without prejudice because the evidence gathered was insufficient. Gov. In Camera Submission, Ex. II. In attempting to explain why the indictment had been sought and the defendant arrested in light of the weak case against him, Zanides observed that "certain investi-

gative steps necessary to corroborate a historical drug conspiracy were not undertaken," in part because the government expected that Marshank, when arrested, would cooperate with the government. *Id.* The government chose to indict and arrest Marshank without sufficient evidence to convict him because they believed that Minkin could ensure Marshank's cooperation. With the defendant's attorney in the government camp, the strength of the government's case against Marshank became irrelevant.

Under *Irwin* and *Horowitz*, interference with the attorney-client relationship is not enough, in and of itself, to constitute a due process violation. There must also be prejudice to the defendant. *Irwin*, 612 F.2d at 1187. Prejudice may manifest itself in a number of ways, including use of evidence gained through the interference, use by the prosecution of confidential information regarding defense plans and strategy, or destruction of the attorney-client relationship. *Id.* Prejudice may also result from "other actions designed to give the prosecution an unfair advantage at trial." *Id.*

It is clear that Marshank was prejudiced by the government misconduct in this case. First, the facts strongly suggest that, absent the government's improper interference with the relationship between Minkin and his clients, there would not have been any indictments against Marshank. Minkin, along with his clients Crawford and Ohlgart, identified Marshank to the government and were thus responsible for his becoming the target of criminal investigation in the first instance. Minkin and his client Seth Booky were instrumental in the pre-indictment investigation of Marshank. During the proceedings before the first grand jury, all three of the witnesses presenting testimony—Seth Booky, Robert Wehe, and David Vandell—were clients of Ron Minkin. Minkin and his clients were also integrally involved in the investigation which resulted in the instant indictment against the defendant. Minkin provided information to the government concerning Marshank on a consistent basis and testified against Marshank during the 1990 grand jury proceedings.

Marshank was also prejudiced in numerous other ways. Evidence obtained through government misconduct was used against Marshank at every turn. The testimony of three of Minkin's clients before the grand jury demonstrates beyond question that the government marshalled the evidence provided by Minkin and his clients to obtain the first indictment. Minkin's cooperation with the government throughout the investigation leading to the instant indictment, his testimony against Marshank before the second grand jury, and the prominence of Seth Booky in the second indictment all lead inexorably to the conclusion that evidence obtained through government misconduct was used to obtain the second indictment against the defendant.

It is also apparent that the government's misconduct in this case was designed to and would give the prosecution an unfair advantage at trial. The court need not retrace the source of the government's evidence against Marshank, other than to say that most, if not all of it, appears to have come directly or indirectly from Ron Minkin. Moreover, while he was in custody Marshank believed that he was being represented by counsel who was uncompromised. In fact, however, Marshank's attorney was in league with the government. Marshank was, for all intents and purposes, unrepresented during his post-arrest meetings with the government. The government took advantage of this situation to obtain incriminating information from Marshank and to engage in post-indictment, post-arrest communications with Marshank outside the presence of counsel.

 Having found a Fifth Amendment violation under *Irwin*, the court must decide the appropriate remedy. In making this determination, the court must tailor the remedy to the injury. *United States v. Rogers*, 751 F.2d 1074, 1078 (9th Cir.1985). The appropriate remedy for a Fifth Amendment violation is generally suppression of the evidence. *Rogers*, 751 F.2d at 1078. However, dismissal of the indictment is appropriate where continuing prejudice from

the constitutional violation cannot be remedied by suppression of the evidence. *United States v. Morrison,* 449 U.S. 361, 365–66 n. 2, 101 S.Ct. 665, 669 n. 2, 66 L.Ed.2d 564 (1981); *Rogers,* 751 F.2d at 1078.

Suppression is an appropriate remedy where the court can identify and isolate the evidence obtained in violation of the defendant's Fifth Amendment due process rights. The prosecution is thus denied "the fruits of its transgression" and the due process right to a fair trial is preserved. *Rogers,* 751 F.2d at 1078. In the case at bar, however, the fruit of the prosecutor's transgression is the indictment itself. In such a situation, it is simply impossible to excise the taint of the government's constitutional transgressions from the prosecution of the defendant. The taint of the government's transgressions spreads to all the evidence obtained against Marshank.

Because of the bizarre circumstances surrounding the investigation and prosecution of the defendant, it is not surprising that neither the parties nor the court has been able to find case law based on facts similar to those found here. However, *United States v. Schell,* 775 F.2d 559 (4th Cir.1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986), is persuasive as to the appropriate remedy. In *Schell,* Jividen, a criminal defense attorney, briefly represented Wilson and Cain, both of whom had been subpoenaed to testify before a grand jury investigating the Gallo drug organization. Several months later, Jividen was hired as an Assistant U.S. Attorney. Jividen informed the U.S. Attorney of his previous representation of Wilson and Cain, and as a result Jividen was not allowed to participate in any way in the gathering of evidence against or prosecution of his former clients. *Schell,* 775 F.2d at 563. However, in his capacity as Assistant U.S. Attorney, Jividen appeared in front of a different grand jury investigating the Gallo drug organization. Jividen's former clients testified before one grand jury and Jividen appeared before another one. *Schell,* 775 F.2d at 563 n. 2.

Wilson and Cain were subsequently indicted along with numerous other alleged members of the drug organization. Both defendants moved to dismiss their indictments on the grounds that Jividen's participation in the grand jury proceeding violated their due process rights.

In *Schell* the government argued that it had engaged in no impropriety, pointing out that Jividen's participation had been limited to prosecution of other members of the drug organization and that the AUSA had been excluded from work on the cases against Wilson and Cain. The prosecution further maintained that Jividen did not possess any confidential information with respect to his former clients. Rejecting the government's argument, the court observed:

> Assuming that all of the government's assertions are true, the fact remains that Jividen represented Wilson and Cain with respect to the very same criminal activity which led to the indictment that he ultimately helped to prosecute and under which Wilson and Cain were convicted.

*Schell,* 775 F.2d at 565. The court then dismissed the indictments against Wilson and Cain, holding that "due process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter." *Schell,* 775 F.2d at 566.

While Ron Minkin was never hired by the U.S. Attorney's office he participated in the prosecution of his own client far more than did the attorney in *Schell.* The government in this case not only took no precautions to separate Minkin's work with the government from the investigation and prosecution of the defendant, but relied on Minkin to build a case against the defendant. As the *Schell* court pointed out:

> The relationship between an attorney and his client is a sacred one. In that relationship, the client must be secure in the knowledge that any information he reveals to counsel will remain confidential. The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal

prosecution of that client *with respect to the identical matter about which the attorney originally counseled the client.* Such switching of sides is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances.

*Schell,* 775 F.2d at 565.

In this case, even more than in *Schell,* the defendant's due process right to a fair trial has been compromised by the government's interference in the attorney-client relationship. As discussed above, the taint of the government's constitutional transgression infected every part of the investigation and prosecution of the defendant. There is no means other than dismissal of the indictment to remedy the due process violation which occurred. *Morrison,* 449 U.S. at 366 n. 2, 101 S.Ct. at 668 n. 2; *Rogers,* 751 F.2d at 1078. The indictment is, therefore, DISMISSED.

B. *Outrageous Government Misconduct*

 A court may also dismiss an indictment when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . ." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *United States v. Simpson,* 813 F.2d 1462, 1464 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987) (*Simpson I*). To constitute a Fifth Amendment violation under *Russell,* the government conduct at issue must be fundamentally unfair and " 'shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)).

 "[T]he determination of when the government's behavior reaches such a 'demonstrable level of outrageousness' to constitute a due process violation is 'at best elusive.' " *United States v. Bogart,* 783 F.2d 1428, 1435 (9th Cir.1986), *vacated on other grounds, U.S. v. Wingender,* 790 F.2d 802 (9th Cir.1986) (quoting *United States v. Jannotti,* 673 F.2d 578, 606 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Therefore, every case must be resolved on its facts. *Bogart,* 783 F.2d at 1438. Whether outrageous government misconduct exists turns on the totality of the circumstances. *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

 In *United States v. Batres–Santolino,* 521 F.Supp. 744, 750–53 (N.D.Cal. 1981), *Russell* was invoked to dismiss an indictment resulting from outrageous government misconduct which induced the defendant to commit a crime. *See also Bogart,* 783 F.2d at 1434–38 (discussing the history of the doctrine's evolution and application). However, because the *Russell* doctrine is grounded in the due process clause of the Fifth Amendment, it may be applied in cases where government interference in an attorney-client relationship is so shocking to "the universal sense of justice" that it violates due process. *See United States v. Ofshe,* 817 F.2d 1508, 1516 (11th Cir.1987).

 The prosecution's argument that its actions were not improper because only Minkin engaged in misconduct is unpersuasive. The Ninth Circuit has distinguished between the government's "passive tolerance" of misconduct and "conscious direction" by government agents, suggesting that the former is less egregious and therefore tempers the outrageousness of any government misconduct. *Simpson I,* 813 F.2d at 1468. In *Simpson I,* a prostitute working as a government informant developed a sexual relationship with the defendant and then helped to arrange a drug transaction between the defendant and undercover agents. Although the government agent on the case eventually learned of the sexual relationship, he did nothing to encourage the informant to use sex to

carry out her assignment and in fact instructed the informant on numerous occasions to refrain from engaging in sexual activity with the defendant. *Id.* at 1467–68. Emphasizing the "unique facts" of the case, the court ruled that the government's conduct was not so outrageous as to shock the conscience. *Id.* at 1468.

The government's actions in this case are far more egregious than the "passive tolerance" of impropriety in *Simpson I.* As the court's findings of fact illustrate, the government actively collaborated with Ron Minkin to build a case against the defendant, showing a complete lack of respect for the constitutional rights of the defendant and Minkin's other clients and an utter disregard for the government's ethical obligations. Unlike the government agent in *Simpson I,* the agents and prosecutor here *never* warned Minkin not to engage in unethical behavior and in fact facilitated that behavior by hiding it from the defendant. Moreover, the government colluded with Minkin to obtain an indictment against the defendant, to arrest the defendant, to ensure that Minkin would represent the defendant despite his obvious conflict of interest, and to guarantee the defendant's cooperation with the government. The government conduct in this case was anything but passive.

The government misconduct in this case, was also outrageous and shocking to the "universal sense of justice."[12] The government investigated Marshank using information received from his own attorney. All of the witnesses who testified before the first grand jury were Minkin's clients and had been made available to the government through Minkin. In addition, Minkin himself testified before the second grand jury.

The government informed neither Booky nor Marshank of Minkin's cooperation with law enforcement authorities and the obvious conflict of interest this created. Nor did government attorneys, who are officers of the court, inform the courts presiding over the prosecutions of Booky and Marshank of the conflict of interest between Minkin and his clients. Indeed, government agents and the prosecutor allowed Minkin to hide his dealings with the government from his clients and participated in the charade.

Having considered the totality of the circumstances, the court concludes that the conduct of the government in the investigation and prosecution of Steven Marshank was so outrageous that it shocked the universal sense of justice. Because the government's conduct was fundamentally unfair, the indictment is DISMISSED.

## II. Sixth Amendment

The defendant contends that the government created a conflict of interest between himself and his attorney which denied him his Sixth Amendment right to counsel. The government denies that it engaged in any misconduct. The government further contends that even if any misconduct did occur, it did not taint the 1990 indictment. Moreover, the government claims that the attorney-client relationship between Minkin and Marshank was invalid because Marshank consulted Minkin in order to carry out illegal activity. Finally, the government contends that Marshank waived the conflict of interest between himself and Minkin by agreeing to pay Seth Booky's legal fees.

 The right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice." *Maine v. Moulton,* 474 U.S. 159, 168–69, 106 S.Ct. 477, 483, 88 L.Ed.2d 481 (1985). The Ninth Circuit has recognized that government misconduct may have a "dev-

---

12. Even members of the grand jury hearing Minkin's testimony in connection with the second indictment had some concerns about Minkin's dual role. One grand juror asked "Didn't you feel that you worked for the government by giving the information from A to B?" Grand Jury 89-3, Testimony of Ron Minkin, June 28, 1990, at 44. Apparently the Grand jury was not satisfied with the answer because once again a grand juror asked, "So you acted as a government agent by making sure Mr. Marshank would cooperate and he would be flown home immediately?" *Id.* at 45. However, before Minkin could answer the AUSA interrupted and the first part of the question was never answered.

astating effect" on a defendant's Sixth Amendment right to counsel. *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978). Indeed, government interference with a defendant's relationship with his attorney may render that attorney's assistance ineffective and thus violate the Sixth Amendment. *United States v. Irwin*, 612 F.2d at 1185. The Sixth Amendment right to effective assistance of counsel includes "the right to be represented by counsel whose loyalties are undivided." *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir.1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980). *See also Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

 Not all government interference constitutes a Sixth Amendment violation. *Irwin*, 612 F.2d at 1186–87. A defendant's Sixth Amendment rights are violated only when the government intrusion results in prejudice to the defendant. *Id.* at 1187. Prejudice may manifest itself in numerous ways, including destruction of the attorney-client relationship. *Id.* at 1187, 1188–89.

 As with a Fifth Amendment violation, a violation of the Sixth Amendment requires a remedy tailored to the injury suffered. *Morrison*, 449 U.S. at 364, 101 S.Ct. at 667; *Rogers*, 751 F.2d at 1078. Once again, in most cases suppression of the evidence, rather than dismissal, is the appropriate remedy. *Morrison*, 449 U.S. at 365–66, 366 n. 3, 101 S.Ct. at 668, 669 n. 3; *Rogers*, 751 F.2d at 1078. However dismissal is appropriate where there is continuing prejudice from a constitutional violation that cannot be remedied by suppression of the evidence. *Morrison*, 449 U.S. at 365–66 n. 2, 101 S.Ct. at 669 n. 2; *Rogers*, 751 F.2d at 1078.

 The prosecution's argument that it engaged in no misconduct is unconvincing because the Supreme Court has explicitly recognized the government's affirmative obligation not to subvert the Sixth Amendment right to counsel. In *Maine v. Moulton*, the Court stated:

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We ... have made clear that, *at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.*

474 U.S. at 170–71, 176, 106 S.Ct. at 484, 487 (emphasis added). Whether government action violates a defendant's right to the assistance of counsel is to be determined in light of this affirmative obligation. *Id.*

 Considering the government's collaboration with Ron Minkin in the investigation, arrest and prosecution of the defendant after his September 1987 indictment, it is beyond cavil that the government failed to fulfil its affirmative obligation as described in *Moulton*. There can be no question but that the government in this case circumvented and diluted the protections guaranteed to the defendant by the Sixth Amendment right to counsel.

 The government maintains that even if it violated Marshank's Sixth Amendment rights in connection with the first indictment, the second indictment against Marshank remains untainted because it involves different charges. The prosecution correctly points out that the Sixth Amendment attaches only after judicial proceedings have been initiated against a defendant in a criminal case. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). However, the government errs in concluding that the defendant's first and second indictments necessarily represent two distinct prosecutions for the purposes of Sixth Amendment analysis.

In *United States v. Valencia*, 541 F.2d 618, 622 (6th Cir.1976), the Sixth Circuit rejected an argument, similar to the one offered by the government here, that the

defendant's Sixth Amendment rights had not been violated because the government interference was related to charges which had been dismissed and was unrelated to the subsequent indictment challenged by the defendant. However, the court ruled that dismissal of an indictment against a defendant does not bring an end to the prosecution of the defendant if the defendant is later reindicted on charges which "grow out of the same dealings that were the subject of the [prior] charges." *Valencia,* 541 F.2d at 622.

■ The *Valencia* holding reflects the core principles of Sixth Amendment doctrine. The Sixth Amendment attaches after the initiation of judicial proceedings because it is at this point that

> the government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.

*Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Having engaged in prosecutorial misconduct the government may not evade the Sixth Amendment simply by dismissing the initial indictment and reindicting the defendant on charges stemming from the same investigation. To hold otherwise would allow the government to use its prosecutorial powers to eviscerate defendants' right to counsel.

■ Applying *Valencia* to the case at bar, the court concludes that the instant indictment is tainted by the government's violation of the defendant's Sixth Amendment right to counsel. The government's investigation of Steven Marshank revolved around an alleged historical conspiracy involving the importation and sale of marijuana and hashish. The first indictment charged the defendant with offenses that allegedly occurred early on in the conspiracy. The record reveals that the first indictment was dismissed in order to give the government the opportunity to gather additional evidence. The facts also show that the government investigation of the defendant was ongoing at the time the indictment was dismissed, and that the government had every intention of continuing the investigation against the defendant until it had sufficient evidence to reindict him.

The Zanides Memorandum explained that in 1987 the government had not gathered sufficient evidence to support a historical drug conspiracy prosecution. Gov. In Camera Submission, Ex. II at 2. In addition, AUSA Zanides complained that the charges against Marshank in the first indictment were *too narrow to* reflect the defendant's alleged "degree of involvement" in drug trafficking. Zanides therefore outlined a plan for the continued investigation of Marshank in order to broaden the charges in a second indictment. *Id.* at 3–4. Following-up on information provided by the "cooperating defendants," Minkin's cooperating clients, was central to this plan. *Id.*

In the months following the dismissal of the first indictment, Minkin remained in frequent contact with government agents so as to assist them in the investigation of Marshank. He arranged a meeting between government agents and his cooperating clients, Ohlgart and Crawford, to encourage the continued cooperation of the two men in the investigation. Minkin had numerous telephone conversations with government agents regarding the investigation leading up to the second indictment of Marshank. Indeed, Minkin's participation in the investigation of Marshank did not end until the defendant filed this motion to dismiss and AUSA Howden advised government agents to cease communication with Minkin.

The proceedings before the second grand jury show that Minkin's client Seth Booky was the government's key witness against the defendant. Booky's testimony took up a substantial portion of the proceedings and was the foundation upon which the government built its case against Marshank. *See* Grand Jury 87–4, Testimony of Seth Booky, July 17, 1988; Grand Jury 89–3, Testimony of Paul Rozairo (reading testimony of Booky), December 14, 1989; Grand Jury 89–3, Testimony of Dan McCur-

rie (reading testimony of Booky), January 11, 1990; Grand Jury 89–3, Testimony of Seth Booky, March 15, 1990.

The second indictment was, unquestionably, a result of the government's ongoing investigation of Marshank, which began in 1986, prior to the first indictment. The overt acts alleged in the second indictment primarily involved illegal activity which Marshank and Seth Booky engaged in together. Indeed, the record of the second grand jury proceedings makes it clear that Booky was the source of virtually all of the allegations of overt acts. Booky was the source of *every* act for which a source was identified. Grand Jury 89–3, Testimony of Robert Heng, July 26, 1990, at 43–44, 46–49, 52, 54, 57, 73–74, 77–78, 80, 81. The testimony of Agent Heng strongly suggests that, with the exception of two acts of which Booky had no knowledge, Booky was the source for each of the forty-four overt acts in which it is alleged that the defendant participated.[13] Booky's prominence is so striking that one of the grand jurors expressed concern that the informant appeared to be the sole source of the government's charges. Testimony of Heng, at 19. Based on the proceedings before the second grand jury, the court concludes that there would have been no second indictment without Booky's cooperation with the government's investigation. In light of these facts, the court finds that the two indictments are, for purposes of Sixth Amendment analysis, part of the same prosecution of Marshank.

 The government argues that the attorney-client relationship between Marshank and Minkin was invalid because the two were engaged in ongoing illegal activity. The government relies on *In re Grand Jury Proceedings*, 867 F.2d 539, 541 (9th Cir.1989), which holds that the attorney-client privilege is vitiated when a client consults an attorney for legal assistance in carrying out a crime. To establish a *prima facie* case for this, so-called crime-fraud exception to the attorney-client privilege, the government must rely on evidence independent of the communications between the client and the attorney. *Id.* In addition, where an attorney has represented a defendant in the same criminal matter in which the attorney is implicated, the crime-fraud exception "does not thereby justify an abrogation of the privilege as to all dealings between the two, as attorney and client." *United States v. Alexander*, 736 F.Supp. 968, 1003 (D.Minn.1990).

---

**13.** Of the thirteen witnesses to appear before the second grand jury in addition to Booky and Minkin, two (Paul Rozario and Dan McCurrie) were government agents reading previous testimony of Booky and two (Maura McNulty and Robert Heng) were government agents relaying information obtained either from Booky or Scott Alexander Moffett. Moffett testified before the grand jury and retracted any statements he made previously concerning Marshank, stating that he had given false information to the government under pressure and in the hopes of receiving a lighter sentence for a drug conviction. Grand Jury 89–3, Testimony of Moffett, at 21–22, 42. Also appearing were Norman Jay Marshank, the defendant's father; Charles Laver of the Sonoma County Sheriff's Department; John Matheson; Wendy Rothcopf; Kenneth Schatzberg; Burt McCumber; Joseph Cooper; and Thomis Larson. Norman Marshank provided no incriminating information concerning the defendant, Grand Jury 89–3, Testimony of Norman Marshank; Laver testified that he knew nothing about Marshank other than rumors he had heard, Grand Jury 89–3, Testimony of Laver, at 14; Rothcopf testified only that she had met the defendant socially three or four times, Grand Jury 89–3, Testimony of Rothcopf,

at 13; McCumber testified that he had never met the defendant and did not recognize Marshank's name, Grand Jury 89–3, Testimony of McCumber, at 32; and Larson provided no testimony concerning the defendant, Grand Jury 89–3, Testimony of Larson.

Matheson, Schatzberg and Cooper did provide some incriminating information concerning Marshank. However, it appears that only the information supplied by Schatzberg, who was identified to the government by Booky, Grand Jury 89–3, Testimony of Heng, at 73, made its way into the second indictment. *See* Second Indictment of Steven Marshank, Overt Acts, para. 31. The overt act contained in the second indictment and testified to by Schatzberg involved a drug transaction between Booky and Schatzberg; the government learned of this transaction from Booky. Grand Jury 89–3, Testimony of Heng. It thus appears that the government relied almost exclusively on Booky in formulating its second indictment against Marshank. Matheson, Schatzberg and Cooper are seemingly "extras" who may have been included in the grand jury proceedings by the government to mask the prosecution's reliance on Booky.

Where a defendant has had discussions with an attorney regarding his or her defense against criminal charges, those conversations are lawful and fall within the ambit of the attorney-client privilege even if there is evidence that the attorney participated in other illegal activity with the defendant. *Valencia,* 541 F.2d at 621.

The government's argument for the crime-fraud exception to attorney-client privilege lacks merit for three reasons. First, while there is evidence in the record that Minkin may have been involved in criminal activity, it is not enough to establish a prima facie case that the defendant consulted with Minkin to complete a crime.[14] Second, discussions between Minkin and Marshank regarding criminal charges *already* facing the defendant do not fall within the crime-fraud exception. *Valencia,* 541 F.2d at 621; *Alexander,* 736 F.Supp. at 1003. Third, the crime-fraud exception was simply not meant to be applied in the manner which the government attempts here. "Because the attorney-client privilege is not to be used as a cloak for illegal or fraudulent behavior, it is well-established that the privilege does not apply where legal representation was secured in furtherance of intended, or present, continuing illegality." *United States v. Hodge and Zweig,* 548 F.2d 1347, 1354 (9th Cir. 1977). The exception is to be considered where the government seeks disclosure of information regarding *continuing* illegality which would otherwise be covered by the attorney-client privilege. *Id.* The exception does not allow prosecutors to ignore altogether the attorney-client relationship.

█ Finally, the government's argument that the defendant waived his conflict of interest with Marshank by paying Booky's legal fees is absolutely meritless. In situations where there is no conflict of interest, a defendant may waive his right to assistance of counsel; however, that waiver must be knowing and intelligent. *See Partin,* 601 F.2d at 1008. Where an attorney represents both a defendant and a

government informant in the same case, the court must disclose the potential conflict of interest to the defendant on the record before there can be a knowing and intelligent waiver. *United States v. Levy,* 577 F.2d 200, 211 (3d Cir.1978) (citing *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)).

Clearly, there was no knowing and intelligent waiver by the defendant in this case. Although Marshank was aware that Minkin was also representing Seth Booky, he had no knowledge of Booky's activities as a government informant or of Minkin's role in facilitating those activities. Indeed, Booky, Minkin and the government hid this information from Marshank. Nor did the court ever disclose the conflict of interest, as the government never informed the court of the joint representation of Booky and Marshank. As the government was aware that Minkin was using a "front attorney" in Booky's case to hide the conflict of interest problem from the court, the government's suggestion that the defendant somehow waived his Sixth Amendment right to effective assistance of counsel is simply galling.

Therefore, the court finds that the indictment must be DISMISSED under the Sixth Amendment.

### III. *Supervisory Power*

█ A court may dismiss an indictment for prosecutorial misconduct either on constitutional grounds or by exercising its supervisory power. *United States v. Carrasco,* 786 F.2d 1452, 1455 (9th Cir. 1986). The three legitimate bases for the exercise of the supervisory power are: (1) to remedy a violation of a statutory or constitutional right; (2) to preserve judicial integrity; and (3) to deter future illegal conduct. *United States v. Simpson,* 927 F.2d 1088, 1090 (9th Cir.1991) (*Simpson II*). The court's supervisory power may be used to vindicate a defendant's rights, as well as to preserve judicial integrity and/or to deter illegal or improper conduct. *United States v. Hasting,* 461 U.S. 499, 505, 103

---

**14.** Indeed, if there was evidence of Minkin's involvement in criminal activity with Marshank, it is curious that the government never undertook to investigate or prosecute Minkin.

S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983); *Carrasco*, 786 F.2d at 1455.

The supervisory power has frequently been used by federal courts as a means of sanctioning and deterring prosecutorial misconduct.[15] "An important function of our supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of the administration of justice." *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir.1974) (Hufstedler, J., concurring).

■ It is well-established that a federal court may use its supervisory power to dismiss an indictment on the basis of government misconduct. *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978). "As such, dismissal is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature." *Id.; see also United States v. Samango*, 607 F.2d 877, 884 (9th Cir.1979) (court exercising supervisory power to dismiss indictment where cumulative effect of errors and prosecutorial misconduct was to produce a biased grand jury); *United States v. Isgro*, 751 F.Supp. 846, 851 (C.D.Cal.1990) (court dismissing indictment because of prosecutorial misconduct before grand jury).

■ While a court may use its supervisory power to dismiss an indictment, dismissal is, generally speaking, a disfavored remedy. *Rogers*, 751 F.2d at 1076–77. For this reason, a court may dismiss an indictment only in "flagrant" cases of prosecutorial misconduct. *U.S. v. Jacobs*, 855 F.2d 652, 655 (9th Cir.1988); *Carrasco*, 786 F.2d at 1455. However, since this standard is so vague that "it fails to illuminate the applicable legal principles, and provides district judges who are called upon to apply it precious little guidance," *U.S. v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386, 1391 n. 6 (9th Cir.1983), courts must determine when to exercise their supervisory power to dismiss an indictment on a case-by-case basis. *United States v. De Rosa*, 783 F.2d 1401, 1406 (9th Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

■ To warrant dismissal, the government's misconduct must not only be flagrant, but must also have prejudiced the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988). As the Supreme Court pointed out in *Bank of Nova Scotia*, "where the error is harmless, concerns about the 'integrity of the [judicial] process' will carry less weight." *Id.* at 255, 108 S.Ct. at 2374 (quoting *United States v. Hasting*, 461 U.S. at 506, 103 S.Ct. at 1979).

■ It is not necessary to review the government's conduct in this case yet again in order to determine whether it is appropriate for the court to exercise its supervisory power to dismiss the indictment against the defendant. The court invokes its supervisory power to dismiss the indictment in order to remedy the violation of the defendant's Fifth and Sixth Amendment rights, to preserve judicial integrity, and to deter future government misconduct.

The court's previous discussion makes clear the need to remedy the violation of the defendant's constitutional rights and to deter future government misconduct. With regard to the preservation of judicial integrity, the court notes that Rule 3–310 of the Rules of Professional Conduct of the State Bar of California provides in pertinent part:

(B) A member shall not concurrently represent clients whose interests conflict, except with their informed written consent.

. . . .

---

**15.** The supervisory power has been used by courts in many contexts, including to reverse a conviction supported by false evidence, *Mesarosh v. United States*, 352 U.S. 1, 14, 77 S.Ct. 1, 8, 1 L.Ed.2d 1 (1956); to punish improper practices by federal attorneys, *United States v. Hale*, 422 U.S. 171, 180 & n. 7, 95 S.Ct. 2133, 2138 & n. 7, 45 L.Ed.2d 99 (1975); *United States v. Banks*, 383 F.Supp. 389, 397 (D.S.D.1974), *appeal dismissed sub nom. United States v. Means*, 513 F.2d 1329 (8th Cir.1975); and to suppress evidence gained by government agents through misconduct. *Mallory v. United States*, 354 U.S. 449, 455–56, 77 S.Ct. 1356, 1359–60, 1 L.Ed.2d 1479 (1957); *Rea v. United States*, 350 U.S. 214, 217–18, 76 S.Ct. 292, 294, 100 L.Ed. 233 (1956).

(F) As used in this rule "informed" means full disclosure to the client of the circumstances and advice to the client of any actual or reasonably foreseeable adverse effects of those circumstances upon the representation.

This court, through its Local Rules, has adopted the State Bar's Rules of Professional Conduct as the applicable standards of professional conduct for the Northern District of California.[16] Rule 3–310 was violated in numerous instances by Ron Minkin. Judicial integrity is severely threatened when professional ethical and court rules such as those involved here are flouted by the government.

The court, therefore, DISMISSES the indictment in the exercise of its supervisory power.[17]

CONCLUSION

The government in this case collaborated with the defendant's attorney in an effort to investigate, arrest and prosecute the defendant. This collaboration included using some of Minkin's other clients as government informants in the defendant's investigation. The government's misconduct in this case robbed the defendant of his right to effective assistance of counsel and his right to due process of law. The government's actions also displayed a complete disregard for the professional duty attorneys owe to their clients and for the ethical obligation prosecutors have as officers of the court.

For these reasons the court DISMISSES the indictment against the defendant on Fifth Amendment grounds, Sixth Amendment grounds and as an exercise of the court's supervisory power.

IT IS SO ORDERED.

---

16. U.S. District Court, Northern District of California, Local Rule 110–3.

17. In determining if government actions are sufficiently egregious to warrant dismissal as a means of deterring future misconduct, courts often have been guided by two considerations. First, courts have looked to whether there is a pattern of similar government misconduct, on the theory that such widespread misconduct increases the threat to judicial integrity. *See, e.g., United States v. Griffith,* 756 F.2d 1244, 1249 (6th Cir.1985), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985); *United States v. Rosenfield,* 780 F.2d 10, 11 (3d Cir.1985), *cert.*

*denied,* 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986). Second, courts have looked to whether there is any alternative remedy which the court may effectively use as a means of deterrence. *Bank of Nova Scotia,* 487 U.S. at 255, 108 S.Ct. at 2374; *Simpson II,* 927 F.2d at 1091–92 (Nelson, J., concurring).

Because the court invokes its supervisory power in part to remedy the violation of the defendant's constitutional rights, and in part because it has already been determined that nothing short of dismissal will remedy this violation, the court need not consider the extent to which the government's misconduct here is part of a larger pattern.