**UNITED STATES of America**

v.

**Zafar SABRI, Defendant.**

**No. 95–CR–199C.**

United States District Court,
W.D. New York.

Aug. 7, 1996.

Kathleen M. Mehltretter, Asst. U.S. Atty., Buffalo, NY, for U.S.

John Human, for Defendant.

CURTIN, District Judge.

On June 10, 1996, United States Magistrate Judge Hugh B. Scott issued a report and recommendation in this case. The Magistrate Judge recommended that the defendant's motion to dismiss Count II be granted. The court has had an opportunity to review the report, the objections filed by the government and by the defense, and has considered oral argument on the objections by both sides.

In review, the court concludes that the report is well-founded and should be affirmed. Therefore, for the reasons given by the Magistrate Judge, the application of defendant to dismiss Count I is denied, but the application to dismiss Count II is granted.

The trial of this matter shall begin on September 3, 1996. Jury selection shall be held on that day. The court will hold a pretrial meeting with counsel on August 15, 1996, at 10 a.m.

So ordered.

## Report & Recommendation

SCOTT, United States Magistrate Judge.

Currently before the Court is defendant's motion to dismiss the indictment, or in the alternative, to suppress certain evidence.

### Background

On November 29, 1995, the Grand Jury issued an indictment charging the defendant with two counts of making threats to kill a United States Judge or federal law enforcement officers (in this case the alleged threat involved employees of the U.S. Immigration and Naturalization Service ["INS"]) in violation of 18 U.S.C. § 115(a)(1)(B).

Count I is based upon statements allegedly made by defendant in a November 2, 1995 conversation with Bonnie Crogan–Mazur, an attorney representing him in certain immigration proceedings. Testifying before the Grand Jury, Crogan–Mazur stated [1] that she previously sent a letter asking him to telephone her to discuss those proceedings. According to Crogan–Mazur, the defendant called her on November 2, 1995. During that conversation, Crogan–Mazur testified that she and the defendant discussed various topics, including her Native–American ancestry and the treatment of Native–Americans. With respect to the immigration proceedings, Crogan–Mazur testified that the defendant "was upset" because of delays in the immigration proceedings. She testified that the defendant blamed INS for causing problems for him for 13 years of his life and that because of INS delays, he was not able to leave the country to go back to Pakistan to see his dying father. According to Crogan–Mazur, the defendant stated that he wanted an opportunity to tell the Immigration Judge about the heartache that all this delay had caused him. When she informed him that his ability to speak to the Immigration Judge may be limited, the defendant allegedly referred to Oklahoma City and Waco [Texas]

---

1. The government, which submitted Crogan–Mazur's grand jury testimony to the Court *in cam-* *era,* has also disclosed the testimony to the defendant.

and stated: "No one listens to anything unless there is violence." According to Crogan–Mazur, the defendant then went on to explain that change only occurs in America in response to "something like Oklahoma City." When she asked if he intended to "do something" at the immigration hearing, the defendant allegedly responded that "killing one or two people ... is a meaningless gesture [that's all that would be present at the hearing]." Crogan–Mazur testified that the defendant then stated: "I have a focused plan that is going to cause change.... Killing 50 to 100 people ... now that is a statement that people will have to be alerted to." (See, Bill of Particulars pp. 1–3) Crogan–Mazur testified that they went on to discuss that killing for a good cause is not considered a bad thing in some cultures.

After this conversation, Crogan–Mazur—who had never met the defendant in person, but had spoken to him by phone on a number of occasions—approached Immigration Judge Michael Rocco and INS trial Attorney John Reed and informed them of the statements the defendant allegedly made during their November 2, 1995 conversation. The FBI was then called in and informed of the alleged conversation. At the direction of the FBI, Crogan–Mazur then agreed to write the defendant another letter asking him to contact her by phone regarding the immigration proceedings. Still acting as the defendant's attorney in the civil immigration proceedings, Crogan–Mazur further agreed to tape the subsequent phone conversation with the defendant (without his knowledge) and to direct her conversation with the defendant back to

the violence topic. (See Government's Response to Defendant's Pretrial Motions, p. 7).

On or about November 10, 1995 [2], the defendant telephoned Crogan–Mazur as directed by her letter. Count II of the indictment is based upon statements allegedly made by defendant in that conversation with Crogan–Mazur. As noted in the Court's March 12, 1996 Decision & Order/Report & Recommendation, the audiotape of the conversation (the transcript was not yet available) submitted to the Court was well over two-hours long. Because the Court could only speculate as to the portions of the conversation the Government intended to assert as constituting a threat, the Court directed the Government to issue a Bill of Particulars setting forth the portions of the November 10, 1995 conversation which constituted the threats upon which Count II of the Indictment are based. Out of the two-hour-plus conversation, the Government identified the following statements as the basis of Count II:

> I'm on the last limit. I may lose control. They [INS] cause me pain—I should cause them pain.
>
> Whatever they [INS] do they get back.
>
> They [INS] should face the consequences then—then I'm the judge, I'm the prosecutor. I'm a man in my land doing certain things I please. (See Bill of Particulars at p. 3)

Before the Court are Defendant's renewed [3] motions seeking the dismissal of the indictment based on alleged prosecutorial misconduct, Grand Jury abuse, violation of defendant's right to assistance of counsel,

**2.** The indictment charges that the statements upon which Count II were based, were stated in a conversation between the defendant and Crogan–Mazur on or about November 10, 1996. The transcript of the audio tape of the alleged conversation reflects that the date of the conversation was November 8, 1995. The defendant has not attacked the indictment based upon this discrepancy.

**3.** Defendant originally filed a motion, with attached affidavit and memorandum dated December 18, 1995, seeking dismissal and or suppression of evidence. On December 21, 1995, defendant's counsel filed an *affidavit* seeking discovery and other relief not addressed in the original motion. On December 29, 1995, an affidavit executed by the defendant was filed

stating that at no time did he waive his attorney-client privilege. On January 22, 1996, defendant filed a *memorandum* raising—for the first time—an argument to dismiss the indictment based upon the defendant's First Amendment rights. On March 12, 1996 this Court issued a Decision & Order/Report & Recommendation which, among other things, directed that the government file a Bill of Particulars. Subsequent to the filing of the Bill of Particulars, on April 5, 1996, defendant renewed the original motions to dismiss and or suppress by submitting a notice of motion accompanied by what appear to be separate copies of the December 18, 1995 and January 22, 1996 memoranda *each* re-dated for April 4, 1996.

violation of defendant's first amendment rights, and pursuant to the Court's supervisory power to dismiss an indictment to rectify error which prejudices a defendant. In the alternative, defendant seeks suppression of evidence based on a violation of the defendant's attorney-client privilege and/or violation of various constitutional rights and or applicable ethical standards.[4]

Several of the issues raised by the defendant are novel, complex and intertwined. The defendant argues that it was prosecutorial misconduct for the government to utilize Crogan–Mazur, and the attorney-client relationship that existed between her and the defendant, to obtain evidence upon which to base charges against the defendant. Upon these same facts, as separate grounds, the defendant also asks the Court to dismiss the indictment based upon an exercise of the Court's supervisory authority or because of violation of the Disciplinary Rules set forth in the Code of Professional Responsibility.

The parties have not cited, and the Court has not found, a similar case in which the government enlisted an attorney representing an individual in on-going civil proceedings to actively use the attorney-client relationship to investigate and obtain evidence against that individual for use in a criminal prosecution.

### 1. Crogan–Mazur's Conduct is Attributable to the Government

Because Crogan–Mazur is not typically a law enforcement officer, it is necessary to determine if her conduct, which is the subject of the defendant's challenges in this case, may be attributed to the government. It is important to distinguish between Crogan–Mazur's conduct in connection with Counts I and II of the indictment. With respect to Count I, Crogan–Mazur is merely a *witness* for the prosecution. According to her Grand Jury testimony, the statements which she interpreted as constituting "threats" were allegedly uttered to her by defendant during the November 2, 1995 conversation. After that conversation, Crogan–Mazur relayed the substance of the defendant's alleged statements to the INS and the FBI. With respect to the allegations upon which Count I are based, the government did little more than receive information from a potential witness that an alleged crime had been committed.

After that, with respect to the allegations asserted in Count II, Crogan–Mazur became the "alter ego", or an agent, of the government; agreeing to utilize her attorney-client relationship with the defendant to initiate contact with the defendant, steer their conversation to the topic of violence, and tape the conversation to preserve it for use by the government in a criminal prosecution. By utilizing Crogan–Mazur as an "agent" in the investigation of possible criminal activity by the defendant, her conduct is attributable to the government. The government does not seriously dispute that Crogan–Mazur's conduct may be attributable to the government for the purposes of the issues raised by the defendant in this motion. See also *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988).

### 2. The Attorney–Client Privilege [5]

As noted above, with respect to virtually each issue raised by defendant, he argues

---

**4.** Inasmuch as the charges against the defendant are based upon two conversations between the defendant and Crogan–Mazur, it is undisputed that the suppression of the challenged evidence— the two conversations—would in effect necessitate dismissal of the respective charges. Thus, the Court herein considers each substantive issue raised by defendant as a request to dismiss the indictment and or to suppress the evidence and will not address the issue of suppression separately, unless otherwise stated.

**5.** Although it is one of the primary arguments asserted by the defendant with respect to each of the issues raised, the defendant's motion papers do not directly address the dismissal of the in-

dictment or the suppression of the evidence based solely on the argument that the alleged statements were subject to the attorney-client privilege. In each case, the defendant states in a somewhat conclusory manner that the statements were protected by the attorney-client privilege and then goes on to argue that as such the government's conduct amounted to a violation of some other right owing to defendant (Sixth Amendment rights; First Amendment rights; Grand Jury abuse; government misconduct etc....). Because this is a common presumption in each of the grounds raised by the defendant, the Court herein addresses it directly.

that any statements allegedly made by him to Crogan–Mazur were subject to the attorney-client privilege, and therefore can not be used as the basis of the charges against him.

■ In general, the attorney-client privilege is fundamental to the judicial process and, indeed, has been called "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961). The critical purpose of the privilege is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interest in the observance of law and the administration of justice. *Id.* Because the attorney-client privilege, like all other evidentiary privileges, impinges on the production of relevant evidence, and thus functions as an obstacle to the fact-finder in the pursuit of truth, the Supreme Court has held that such privileges should not be expansively construed. *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108–09, 41 L.Ed.2d 1039 (1974).

■ However, not all communications with a lawyer are privileged. The attorney-client privilege attaches: (1) where legal advice of any kind is sought, (2) from a professional legal advisor, (3) the communications relate to that purpose, (4) made in confidence, (5) by the client, (6) are at [the client's] instance permanently protected, (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived. *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036 (2d Cir.1984) *citing United States v. Bein,* 728 F.2d 107, 112 (2d Cir.1984) *quoting United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961). A person's subjective belief that the conversation was privileged is not by itself sufficient to establish the privilege. *United States v. Keplinger,* 776 F.2d 678, 700 (7th Cir.1985) *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). Finally, the burden of establishing the existence of the privilege rests upon the proponent of the privilege. *In re Grand Jury Subpoena Dated January 4, 1984,* 750 F.2d 223, 224 (2d Cir.1984).

Nevertheless, the attorney-client privilege serves a critical function in the operation of the law and may not be disregarded lightly. *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682; *Allen v. West Point–Pepperell Inc.,* 848 F.Supp. 423 (S.D.N.Y.1994).

Although the government concedes that the conversations upon which the underlying charges are based took place within the context of an attorney-client relationship, the government argues that the statements are not related to the legal advice sought and are in furtherance of a crime, and therefore, are not protected by the attorney-client privilege.

A proper analysis of the whether the statements are protected by the attorney-client privilege must start with an examination of the language used and an application of the factors as set forth in *In re Grand Jury Subpoena Duces Tecum,* supra. The defendant's original motion papers, perhaps because the government had not yet specified the portions of the conversations which it contended to constitute the threats, made no attempt whatsoever to provide any such analysis. Similarly, however, the papers filed in support of the instant motion—which were filed *after* the government's Bill of Particulars specified the relevant language—also fail to provide any analysis to establish that the statements are subject to the privilege. Instead, the defendant merely concludes that because an attorney-client relationship existed between Crogan–Mazur and the defendant, the communications are protected.

■ Upon its own review of the statements at issue and the context of the conversations between Crogan–Mazur and the defendant (as best as can be discerned at this stage of the proceedings), this Court concludes that the alleged statements are *not* related to the legal advice sought by defendant from Crogan–Mazur—that is, advice in connection with the immigration proceedings concerning defendant's alien status and/or his ability to leave the country to visit his dying father. The statements allegedly made by defendant relate to the use of violence to affect political change or to exact personal revenge. Defendant has not provided any argument that such topics were legiti-

mately relevant or material to the issues involving the defendant's immigration status.

■ Moreover, the alleged statements by defendant may be excluded from protection by the attorney-client privilege as statements made in furtherance of a crime. In this case, the statements *are* the alleged crime. The "crime-fraud exception" has been applied to reject protection by the attorney-client privilege in analogous (though not similar) cases. See *United States v. Sutton,* 732 F.2d 1483, 1491 (10th Cir.1984) (privilege not applicable to client's statements to attorney that he intended to destroy records sought by the government); *In re Doe,* 551 F.2d 899 (2d Cir.1977) (plan to bribe juror not protected); *United States v. Gordon–Nikkar,* 518 F.2d 972, 975 (5th Cir.1975) (plans to commit perjury not protected); *United States v. Keys,* 67 F.3d 801, 807 (9th Cir.1995) (announced plans to engage in future criminal conduct not protected). Particularly instructive is *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) wherein the Supreme Court held that a defendant's statements to his attorney that he planned to bribe or threaten a witness would not be subject to the attorney-client privilege. In *Nix,* the defendant's attorney threatened to withdraw as counsel if the defendant went through with his plans to commit perjury or to bribe or threaten witnesses or jurors. In denying the defendant's subsequent claim that his counsel's threat to withdraw as counsel and expose the plan denied him effective assistance of counsel, the Supreme Court stated:

> A defendant who informed his counsel that he was arranging to bribe or threaten witnesses or members of the jury would have no "right" to insist on counsel's assistance or silence. Counsel would not be limited to advising against that conduct. An attorney's duty of confidentiality, which totally covers the client's admission of guilt, does not extend to a client's announced plans to engage in future criminal conduct.

*Nix,* 475 U.S. at 174, 106 S.Ct. at 998.

Based on the above, the defendant has not established that the attorney-client privilege

protects the alleged statements from disclosure by Crogan–Mazur.

### 3. Defendant's Sixth Amendment Right to Assistance of Counsel

■ The defendant argues that the entire indictment should be dismissed because the government's use of the defendant's conversations with his counsel constitute a violation to his Sixth Amendment right to the assistance of counsel. This argument lacks merit.

■ The Sixth Amendment right to assistance of counsel does not attach until "judicial proceedings" of some nature have been initiated against the defendant. *Brewer v. Williams,* 430 U.S. 387, 396–99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). Defendant's motion papers do not even argue that "judicial proceedings" had been initiated at the time of the two conversations between the defendant and Crogan–Mazur. Instead, the defendant's argument focuses on cases in which the government in some way interfered with the defendant's relationship with the attorney representing him in a *criminal* proceeding. In the instant case, Crogan–Mazur represented the defendant in otherwise unrelated *civil* proceedings prior to the initiation of any criminal judicial proceedings. Thus, dismissal of the indictment or suppression of the evidence based upon defendant's Sixth Amendment claim is unwarranted.

### 4. Defendant's First Amendment Rights

The defendant also claims that "where the words themselves constitute the crime, the crime cannot be committed when the words are spoken to one's attorney within the attorney/client relationship." (See Defendant's April 4, 1996 Memorandum with respect to the First Amendment Claim at p. 1.) However, the defendant cites no authority whatsoever for the proposition that the attorney-client context of the conversation implicates the First Amendment and precludes prosecution.

The cases cited by the defendant [6] discuss the distinction between "political hyperbole"

---

6. The cases cited by defendant discuss 18 U.S.C. § 871 (making threats against the President) and not 18 U.S.C. § 115 (making treats against a United States Judge or law enforcement officers), the statute upon which the indictment against

(which is protected by the First Amendment) and actual "threats" (which are not protected). In the primary case cited by defendant, *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969), the defendant's statements were made in the context of a political discussion about the draft (at a time when the Vietnam War was on-going). According to an investigator for the Army Counter Intelligence Corps, the defendant in *Watts* stated: "They always holler at us to get an education. And now I have already received by draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Watts*, 394 U.S. at 706, 89 S.Ct at 1401. In that case, the Supreme Court reversed a jury verdict convicting the defendant holding that "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted [as a threat]." *Watts*, 394 U.S. at 708, 89 S.Ct at 1402.

The Supreme Court's determination in *Watts* amounts to a determination that given the facts and circumstances presented to the jury, a rational jury could not find that the defendant's statement constituted a threat as prescribed by the statute. In the instant matter, and particularly without the benefit of a more exacting scrutiny of the circumstances surrounding the statements (and indeed, with respect to Count I, the actual language used) which comes to light in the trial process, this Court is not persuaded that no rational jury could interpret the alleged statements to be "threats" as a matter of law. It is well-settled that absent unusual facts the "existence *vel non* of a 'true threat' is a question generally best left to a jury." *United States v. Malik*, 16 F.3d 45, 51 (2d Cir.1994) citing *United States v. Carrier*, 672 F.2d 300, 306 (2d Cir.) *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982).

 The only "unusual" circumstance articulated by defendant is the fact that the alleged statements in the instant case were made during a conversation with the defen-

dant's counsel. Defendant's argument that because of the privileged nature of attorney-client communications, defendant's utterance of the alleged statements "is the same as thinking the thought to one's self." (See Defendant's April 4, 1996 Memorandum with respect to the First Amendment Claim at p. 2). Of course, if this were true there would be no exceptions to the attorney-client privilege (i.e. statements unrelated to the legal advice sought; statements in furtherance of a crime). Whether the statements in this case are *privileged* because they were uttered in the context of an attorney-client conversation does not necessarily mean that the statements constituted "political hyperbole" rather than "threats." Thus, dismissal of the indictment or suppression of evidence on First Amendment grounds is not warranted.

### 5. *Grand Jury Abuse*

 Defendant contends that by playing the audiotape of the November 10, 1995 conversation between the defendant and Crogan–Mazur to the Grand Jury, the entire process was tainted. Defendant's argument is based upon an assumption that the tapes were obtained "in violation of the Fifth Amendment, Sixth Amendment and ethical obligations of both the private attorney and the government."

 Even if the Court were to assume that the tapes were to be considered improper evidence, dismissal of the indictment on grounds of Grand Jury abuse would be unwarranted. The Grand Jury is an investigative body, and thus, it is not bound by the formal rules of evidence. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As stated in *In re Sealed Case*, 877 F.2d 976 (D.C.Cir.1989):

> Although a grand jury may not itself violate a valid privilege, it may consider evidence obtained in violation of the Fourth Amendment, or the Fifth Amendment, or that would otherwise be incompetent at trial.

*In Re Sealed Case*, 877 F.2d 976 (D.C.Cir. 1989) citing *Calandra*, 414 U.S. at 351–52, 94 S.Ct. at 621–22 (Fourth Amendment); *Lawn*

---

the defendant is based. For analysis purposes, this distinction appears to be immaterial.

*v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) (Fifth Amendment), and *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (indictment may be based on solely on hearsay).

The record does not support a finding that the audio tape of the November 10, 1995 influenced the Grand Jury's decision to indict the defendant as to Count I. Although the defendant concludes that playing the tapes "affected Count I," he does not explain why or how. As described above, although the taped November 10, 1995 conversation is over two-hours long, the government has identified only three brief statements as constituting the offending language. Moreover, the language of the three statements is extremely mild compared to Crogan–Mazur's description of the language used by defendant in the November 2, 1995 conversation. Further, while some of the other topics discussed on the audiotape of the November 10, 1995 conversation may portray the defendant negatively, others make him appear sympathetic. The record, to the extent it has been developed by the parties, does not reflect that an abuse of the grand jury process occurred in the instant case. See *Bank of Nova Scotia v. United States*, 487 U.S. 250, 262, 108 S.Ct. 2369, 2377–78, 101 L.Ed.2d 228 (1988)

With respect to Count II, as noted above, if the District Court were to determine that the taped November 10, 1995 conversation was obtained in violation of the defendant's Fifth or Sixth Amendment rights, or were to be suppressed for any reason, then Count II would necessarily be dismissed. Thus, the issue as to Grand Jury abuse with respect to Count II would be moot. If the taped November 10, 1995 conversation is not found to be improper, then there is no basis for defen-

dant's argument that playing the tape constituted Grand Jury abuse.

At this stage of the proceedings, dismissal of the indictment or suppression of any evidence based upon the alleged Grand Jury abuse would be unwarranted.

### 6. *Violation of Disciplinary Rules*

The defendant also seeks suppression because of the Crogan–Mazur's alleged violation of applicable disciplinary standards and ethical rules. The defendant does not specify whether he seeks to suppress the November 2, 1995 conversation, the November 10, 1995 conversation, or both. Defendant alleges that the government, through the conduct of Crogan–Mazur, violated several provisions of the Code of Professional Responsibility (the "Code"), including: Disciplinary Rule ("DR") 7–104(A)(1) (an lawyer shall lot communicate with a party when the lawyer knows that the party is represented by a lawyer): DR 7–101 (a lawyer shall represent a client zealously); DR 4–101 (a lawyer shall preserve client confidences); DR 5–101, 5–105 [7] and 5–108 (a lawyer shall not represent a party when a conflict of interest exists between the lawyer and client); and the American Bar Association Commission on Ethics and Professional Responsibility, Formal Opinion 337 (prohibits a lawyer from recording a conversation without the prior consent of all speakers).[8] It should be noted that the defendant fails to provide any authority to support the proposition that evidence may be suppressed based upon a violation of any of the cited provisions, with the exception of DR 7–104.

Once again, it is useful to differentiate between Crogan–Mazur's conduct as it relates to Count I and Count II of the indictment: Crogan–Mazur's conduct in connection with Count I of the indictment does not

---

**7.** Defendant's motion papers actually cite as follows: "(DR 5–101, 5104, 5–108)." The reference to "5104" obviously involves a typographical error. Inasmuch as DR 5–104 concerns continuing commercial business relationships with law clients an is not relevant to the facts of this case, the Court construes this to be an intended reference to DR 5–105 which prohibits a lawyer from continuing to represent a client once a conflict of interest arises. This is consistent with the text of defendant's argument.

**8.** Rule 57.4 of the Local Rules of Criminal Procedure of the United Stated District Court for the Western District of New York provide that the "Code of Professional Responsibility of the American Bar Association as adopted by the New York State Bar Association shall be enforced by this court".

appear to have violated any ethical precepts. As discussed above, with respect to Count I, Crogan–Mazur is merely a *witness* for the prosecution. In fact, pursuant to DR 4–101(C)(3), the Code specifically allows a lawyer to reveal the confidences of a client who intends to commit a crime.

Once she had revealed the information relating to the November 2, 1995 conversation, Crogan–Mazur's conduct is not so easily dealt with. Not only did Crogan–Mazur agree to tape her next conversation with the defendant, she used the attorney-client relationship that she had with the defendant to initiate the communication, and then proceeded to direct the conversation to the topic of violence after exhorting the defendant that for her to do her job as his attorney, he must be completely honest and frank with her.[9]

The defendant's argument relies almost entirely upon *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988) wherein the Second Circuit held that evidence obtained in violation of DR 7–104 may be suppressed. In *Hammad*, the prosecutor issued a grand jury subpoena for an informant, not to obtain that informant's appearance before the grand jury, but to create a pretense that might help the informant elicit admissions from a suspect who the prosecutor knew was already represented by counsel. In discussing the interplay between constitutional protections afforded to defendants in criminal proceedings and the provisions of the disciplinary rules the Second Circuit stated:

> The Constitution defines only the "minimal historic safeguards" which defendants must receive rather than the outer bounds of those we may afford them. . . . In other words, the Constitutions prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise. The Model Code of Professional Responsibility, on the other hand, encompasses the attorney's duty "to maintain the highest standards of ethical conduct." . . .

The Code is designed to safeguard the integrity of the profession and preserve public confidence in our system of justice. It not only delineates an attorney's duties to the court, but defines his relationship with his client and adverse parties. Hence, the Code secures protections not contemplated by the Constitution.

*Hammad*, 858 F.2d at 839 (citations omitted).

The Court went on to conclude that a broad reading of DR 7–104 could impede legitimate investigatory practices. Specifically, the Court was concerned that career criminals with permanent "house counsel" could immunize themselves from infiltration by informants. *Hammad*, 858 F.2d at 839. Notwithstanding that holding, however, the Court recognized that in some instances a government prosecutor may overstep the already broad powers of his office, and in doing so violate the ethical precepts of DR 7–104. The Court in *Hammad* concluded that the prosecutor's conduct contributed to the informant becoming an *alter ego* for the government and violated DR 7–104. *Hammad*, 858 F.2d at 840. Notwithstanding such a finding, however, the Second Circuit concluded that exclusion of evidence is only a permissible, and not a necessary consequence, resulting from a violation of DR 7–104. In that case, the Court reversed the District Court's suppression of the evidence holding that "the government should not have its case prejudiced by suppression of its evidence when the law was previously unsettled in this area." *Hammad*, 858 F.2d at 842.

More importantly, perhaps, it should also be noted that the Second Circuit restrictively defined the reach of *Hammad*, stating that "[t]he principal question presented to us herein is . . . to what extent does DR 7–104 restrict the use of informants by government prosecutors prior to indictment, but *after a suspect has retained counsel in connection with the subject matter of a criminal in-*

---

9. The transcript of the November 10, 1995 conversation reflects that Crogan–Mazur initiated the conversation with the following directions to the defendant:

> . . . what I needed to say to you is, some of the questions that I'm going to ask you may seem

insulting of your character. . . . Or of your manhood. . . . And what I want you to do is *I don't want you to hold back in your responses to me, okay?* . . . I have to ask these rather provocative questions to get to the truth and also . . . *I need to know how you're going to react to certain things.* (T. at p. 3).

*vestigation?"* *Hammad,* 858 F.2d at 839 (emphasis added).

In the instant case, the defendant had not retained counsel in connection with the subject matter of the criminal investigation at the time in question. Thus, *Hammad* does not directly address the circumstances in the present case.

Moreover, the applicability of DR 7–104 may also be questioned. DR 7–104 prohibits a lawyer from communicating with another party who is known to be represented by *another* lawyer. Here, the person communicating with the defendant *was* the defendant's lawyer.

██ Although the defendant cited, albeit somewhat superficially, to several other Code provisions, the government completely failed to respond to the defendants allegations regarding the alleged ethical violations other than as to DR 7–104. While the application of several of the other cited provisions may also be questioned,[10] the Court believes that the conduct of Crogan–Mazur—although seemingly well-intentioned—clearly violated DR 7–101.[11]

DR 7–101(A)(3) requires a lawyer to represent a client zealously and prohibits a lawyer from causing "prejudice or damage" to the client during the course of the professional relationship, except as required under DR 7–

102. The relevant part of DR 7–102 provides that

(b) A lawyer who receives information clearly establishing that: (1) The client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal, except where the information is protected as a confidence or secret.

██ This provision is generally consistent with DR 4–101(C). The effect of both provisions is to allow an attorney to disclose information relating to a crime or fraud even though that information was obtained in connection with an attorney-client relationship. To go beyond mere disclosure of the information, and to use the attorney-client relationship to investigate the client, as was done in this case, is a violation of DR 7–101(A)(3). It can not be argued, and the government does not argue, that defendant was not prejudiced by this conduct on the part of Crogan–Mazur.

As noted above, the defendant has not presented authority establishing that dismissal of the indictment or suppression of evidence may be ordered based upon the

**10.** Because the record, as developed by the defendant, is inadequate to determine the applicability of DR 4–101, DR 5–101, DR 5–105, DR 5–108 and Formal Opinion 337, defendant's request for relief based upon the alleged violation of these provisions should be denied without prejudice to be reasserted, if appropriate, in a post-trial motion.

**11.** Although the record is not sufficiently developed to make conclusive findings, a strong case can be made that the spirit, if not the letter, of DR 5–101(C), DR 5–102 and DR 5–105 may have been violated.

DR 5–101(C) provides that a lawyer shall not *accept employment* in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer may be called as a witness other than on behalf of the client, and it is apparent that the testimony would or might be prejudicial to the client. DR 5–102 requires that a lawyer withdraw from representing a client *as an advocate* after if becomes obvious that the lawyer may be called as a witness and that the testimony to be given by the lawyer is prejudicial to the client.

DR 5–105 provides that a lawyer shall not continue *multiple employment* if a client will be adversely effected.

Literally, the language of these provisions appear to restrict their application to situations in which a lawyer is representing a client as an advocate in front of a court or tribunal; or where a lawyer is representing two clients. The parties did not discuss the applicability of these provisions to the case at hand, thus the record is insufficient. In spirit, however, it seems that each of these provisions seeks to prohibit a lawyer from continuing to represent an individual once a conflict of interest between the lawyer and the client arises. By agreeing to continue to investigate the defendant after she revealed the November 2, 1995 statements to the FBI, it may be said that a conflict of interest existed and that Crogan–Mazur should have immediately withdrawn as his attorney. By continuing to represent the defendant, and by expressly using the attorney-client relationship to obtain further evidence to be used against the defendant in a criminal prosecution, Crogan–Mazur may well have violated these provisions.

violation of DR 7–101. However, as presented in this case, the suppression of evidence based upon a violation of DR 7–101 is consistent with the Second Circuit's rationale in *Hammad* that the "Code is designed to safeguard the integrity of the profession and preserve public confidence in our system of justice. It not only delineates an attorney's duties to the court, but defines his relationship with his client and adverse parties. Hence, the Code secures protections not contemplated by the Constitution." *Hammad*, 858 F.2d at 839 (citations omitted).

Allowing an attorney who represents an individual in a civil proceeding, to use the attorney-client relationship and to act as an agent for the government to investigate that same individual, could have profound repercussions on the attorney-client relationship as we know it. Where an individual is engaged in civil litigation with a commercial competitor, can the government enlist the attorney representing one of the parties to act as an agent for the government to investigate whether his client has violated any anti-trust laws? Where an individual is engaged in civil tax litigation with the government, can the government enlist the attorney representing that individual in the civil matter to act as an agent for the government to determine if a criminal tax case can be brought against the individual? In that same situation, could the government enlist the attorney to investigate whether the individual committed some unrelated crime? This Court believes that it is simply impermissible to abridge the attorney-client relationship in this manner.

None of the concerns regarding or impeding the investigatory ability of the government or the use of "house counsel" to immunize career criminals from infiltration by

informants are at issue in this case. Prohibiting the government from using, as informants, attorneys who have an on-going attorney-client relationship with the suspects of a criminal investigation will not impede the investigatory process in any real manner. Indeed, the lack of any case with similar factual circumstances may be indicative of just how foreign such manipulation of the attorney-client relationship is to the generally accepted principles of criminal justice in this country. Thus, this is a stronger case than *Hammad* in support of the suppression of evidence because of the Code violation.

In light of the above, and subject to the peculiar facts of this case, the Court finds that suppression of the November 10, 1995 conversation between the defendant and Crogan–Mazur is warranted based upon the violation of DR 7–101.

### 8. *Prosecutorial Misconduct*

The defendant argues that dismissal of the entire indictment is warranted on grounds of prosecutorial misconduct.

 Dismissal of an indictment or outrageous government conduct, although rare, is permissible. A Court may dismiss an indictment when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction ..." *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). See also *U.S. v. Cuervelo*, 949 F.2d 559 (2d Cir.1991); *United States v. Marshank*, 777 F.Supp. 1507 (N.D.Cal. 1991).[12]

 The underlying facts upon which the defendant's claim of government misconduct are fully discussed above, and thus, will not

**12.** The *Marshank* case "is a shocking tale of a criminal defense attorney who was oblivious to the professional norms of ethical behavior and a cast of overzealous government agents and prosecutors who facilitated the attorney's unethical conduct in an attempt to catch 'a bib fish.'" *Marshank*, 777 F.Supp. at 1512. In *Marshank*, which in many aspects is factually the most similar case to the instant case, the government conspired with a criminal defense attorney who used his attorney-client relationship with three separate defendants, all allegedly members of a drug ring, to manipulate them into providing information against each other (and perhaps others). In addition, throughout the duration of his attorney-client relationship with these individuals, the attorney continued to feed information to the government. The principle difference between *Marshank* and the instant case is that the attorney in *Marshank* had been retained by the defendant for representation in connection with the criminal investigation and the defendant's Sixth Amendment right had thus attached.

be repeated here. As discussed above, the Court does not find that the conduct of Crogan–Mazur (which is attributable to the government) as it relates to Count I is outrageous or improper in any way.

[19] With respect to Count II, however, the Court finds that the government's manipulation of the attorney-client relationship as described above is offensive to the principles which underlie our criminal justice system. This is particularly so in light of the fact that the attorney used the relationship to initiate communications with the defendant, exhort him to be frank and not to hold back in his responses to her questions, and then directed the conversation to the topic of his pervious comments about violence. The Court concluded that the government's conduct as to Count II of the indictment is outrageous and violative of the defendant's Fifth Amendment due process rights.

The government's primary response to defendant's motion to dismiss based upon government misconduct was to ask that the matter be deferred to the conclusion of trial citing *United States v. Dyman,* 739 F.2d 762 (2d Cir.1984) [13]. While the Court does have discretion to defer such a motion until after trial, the utility of doing so is not present in this case. In *Dyman,* the motion was deferred until after trial because it would have necessitated a hearing at which much of the testimony to be offered at the trial would be duplicated. In the instant case, there is no material dispute as to the conduct which lies at the base of the defendant's claim. Thus, no evidentiary hearing is required. Moreover, even in circumstances in which an evidentiary hearing is required, the Second Circuit has held that "it is clearly preferable if such a motion is filed sufficiently in advance of trial so that the district judge has a full opportunity to decide whether a pre-trial hearing is necessary ... to decide the motion and to furnish a sufficient record." *Cuervelo,* 949 F.2d at 567. The motion would be deferred if it was not filed sufficiently before trial. *Id.* The motion in the instant matter was filed sufficiently before trial.

13. The government also suggests that no government misconduct occurred because defendant's

Although, in response to the defendant's request that the Court exercise its supervisory power to dismiss the indictment, the government argues that it had no other means of investigating the allegations, such a claim is not persuasive. The government makes no attempt to state why the more traditional methods of investigation (phone taps, surveillance, field investigations, etc ....) would not have been available.

Finally, the government asserts that the use of undisclosed informants to consensually intercept conversations with suspects is a legitimate investigative technique, and thus, the government's conduct was not improper in this case. As a general matter, the use of informants is a prevalent, effective and legitimate investigative technique. However, this does not mean there are no limits as to how and when the technique is employed. See *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988). Thus, the fact that the informant was the defendant's attorney, and that the attorney-client relationship was the vehicle used to aide in the informant's ability to obtain admissions from the defendant distinguishes this case from those cases in which the government legitimately enlists an informant to tape conversations with the defendant.

Based on the above, the Court finds that Count II of the indictment should be dismissed against defendant because of the government's misconduct.

### 9. *The Court's Supervisory Authority*

Finally, the defendant also seeks to have the entire indictment dismissed upon an exercise of the Court's supervisory power. For the reasons stated above, the Court does not find the conduct by Crogan–Mazur relating to Count I to be improper in any way. Nor does the Court find that Crogan–Mazur's conduct with respect to Count II necessarily influenced the Grand Jury to indict the defendant on Count I. The defendant has not demonstrated prejudice with respect to Count I. Thus, the Court will consider this application only with respect to Count II of the indictment.

Sixth Amendment right had not yet attached. This fact, however, is not dispositive of the issue.

■ The use of the Court's supervisory power to dismiss an indictment is even more rare, and limited, than dismissal based upon government conduct.[14] It is settled, however, that supervisory power to dismiss an indictment, although extremely limited, does exist. *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Brito*, 907 F.2d 392 (2d Cir.1990). To warrant dismissal, the government's conduct must not only be flagrant, but must also have prejudiced the defendant. *Bank of Nova Scotia*, 487 U.S. at 254, 108 S.Ct. at 2373.

This issue is more commonly raised in connection with irregularities in the grand jury proceedings. Given the peculiar facts of this case, it is not unexpected that there is little helpful precedent. *United States v. Marshank*, 777 F.Supp. 1507 (N.D.Cal.1991), however, is helpful. In *Marshank*, as here, the Court found that the attorney's conduct was attributable to the government and constituted a violation of the defendant's Fifth Amendment rights.[15] In addition, the Court went on to exercise it's supervisory power to dismiss the entire indictment against the defendant citing the attorney's violation of the Rules of Professional Conduct of the State Bar of California.[16] In justifying this extreme sanction, the court stated:

> Judicial integrity is severely threatened when professional ethical and court rules such as those involved here are flouted by the government.

*Marshank*, 777 F.Supp. at 1530.

As discussed above, the government's manipulation of the attorney-client relationship, even those relationships which relate to civil matters, may have profound implications upon the nature of the attorney-client rela-

tionship and the integrity of the judicial process. Although the government claims that no other means of investigation were available (Response of the United States to Defendant's Pretrial Motions, p. 15), such a claim is disingenuous. Law enforcement agencies have an array of investigation techniques at their disposal (phone taps, surveillance, etc ... ) which would have been more appropriate than enlisting the defendant's attorney to extract further evidence and tape conversations. There is no need to add to the challenges of our criminal justice system, or to increase the public's distrust, by making it permissible for lawyers to act in concert with the government to investigate their own clients.

■ The court finds that with respect to the inclusion of Count II in the indictment, the defendant was clearly prejudiced by the manipulation of the attorney-client relationship and that the Court's limited supervisory power should be exercised to dismiss Count II of the indictment.

### Conclusion

Based on the forgoing, the Court respectfully recommends the defendant's motion be GRANTED IN PART, DENIED IN PART, and that Count II of the indictment be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed.R.Civ.P. 72(b) and WDNY Local Rule 72(a)(3).**

---

14. Some courts have questioned whether the Court possesses any such authority. See *United States v. Lau Tung Lam*, 714 F.2d 209 (2d Cir. 1983).

15. As noted above, the Court in *Marshank* also found a Sixth Amendment violation which is not present in the instant case. Although this distinction adds an additional layer to the *Marshank*

case that is not present in the case at hand, the Court does not believe that this distinction serves to lessen the severity of the manipulation of the attorney-client relationship in the instant case.

16. In that case, the Court found a violation of Rule 3–310 which prohibited a lawyer from "concurrently represent[ing] clients whose interest conflict." *Marshank*, 777 F.Supp. at 1529.

FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985): *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d Cir.1995); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See *Paterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis ˙for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(a)(3) may result in the District Court's refusal to consider the objection.**

So ordered.

Dated: June 10, 1996.